Thomas W. Krause, Esq. (Pro Hac Vice Pending)
108 N. Cherry St.
Falls Church, VA 22046
Tel: 703-597-8440; Fax: 571-273-8740
tkrause@cox.net

TEMMERMAN, CILLEY & KOHLMANN, LLP
Robert E. Temmerman, Jr., Esq. (CA Bar No. 96175)
2502 Stevens Creek Boulevard
San Jose, CA 95128
Tel: 408-290-7210; Fax:  408-998-9700
rtemmerman@tcklaw.com

Attorneys for Plaintiff Harry D. Krause, Trustee

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| The Richard Musgrave Bypass Trust, by Harry D. Krause, Trustee,<br><br>            Plaintiff,<br><br>    v.<br><br>Peggy B. Musgrave, Pamela J. Clyne, Dennis R. Book, Book & Book, LLP, and Does 1-10,<br><br>            Defendants. | Case No. 5:15-cv-02280<br><br>**COMPLAINT FOR DAMAGES AND SURCHARGE FOR BREACH OF FIDUCIARY DUTY, BREACH OF TRUST, CONVERSION, UNJUST ENRICHMENT, AIDING AND ABETTING, FAILURE TO LODGE WILL, MALPRACTICE, AND TO COMPEL PRODUCTION OF TRUST RECORDS** |

## **COMPLAINT**

Plaintiff Harry D. Krause, Trustee of the Richard Musgrave Bypass Trust alleges:

## **INTRODUCTION**

1.  This is an action to recover damages for breaches of fiduciary duty, breaches of trust, conversion, and unjust enrichment in connection with the funding and administration of the

Richard Musgrave Bypass Trust (the "Bypass Trust").  The action also seeks to compel production of documents relating to the Bypass Trust.

2.   Defendant Peggy Musgrave ("Peggy") served as trustee of the Bypass Trust, and in that capacity was responsible for carrying out Richard and Peggy's joint intent with respect to their jointly held assets, and in particular, for conducting a fair and just property division upon Richard's death.

3.   The intent of the parties, as reflected in the couple's estate planning documents and agreements, had been that their assets would be shared equally during life (even though more of the couple's assets were originally in Richard's name than in Peggy's), and that upon the death of the first spouse, that spouse's half-share of the assets would be held in trust for his or her chosen beneficiaries, subject to the survivor's access to the assets (and income) under certain circumstances.

4.   After Richard's death in 2007, and despite her fiduciary obligations to Richard's named heirs and beneficiaries, Peggy Musgrave presided over a division of property in which her "half-share" of the couple's assets turned out to be approximately 70% of the couple's joint assets and exceeded Richard's share by more than $1.4 million.  In effecting this result, Peggy was aided and abetted by Defendant Dennis Book, of Defendant Book & Book, LLP, the attorney who handled Richard and Peggy's estate plan, and provided legal services in connection with the property division.

5.   Peggy withheld information about the property division – and took steps to prevent its coming to light – from the time of its occurrence in March 2008 until her resignation as trustee in May 2014.  Since Summer 2014, when the beneficiaries first learned of the improper property division, Peggy and those acting on her behalf have continued to withhold relevant information

and documents from the current trustee and beneficiaries, despite a statutory obligation to provide it.

6.   During her trusteeship, Peggy also appointed her daughter, Defendant Pamela Clyne, as co-trustee, despite an obvious conflict of interest.

7.   When the current trustee (Harry Krause) learned of the improper property division in Summer 2014 (after receiving an incomplete copy of Dennis Book's files from Peggy's then-attorney Minda Parrish), he notified both Peggy and Pamela of his concerns and requested an explanation.  He also requested further documents that might shed additional light on the propriety or impropriety of the property division.  Despite repeated subsequent requests to Peggy, Pamela, and/or their representatives, no documents whatsoever were received between September 2014 and May 10, 2015.  During this period, document requests directed to former co-trustee and co-Defendant Pamela Clyne elicited taunts and insults.  Mr. Book similarly failed to respond to reasonable requests over this period.

8.   After Peggy's attorney was provided with a draft version of this complaint, on or about April 13, 2015, Peggy and Pam authorized the release of 24 pages of documents by their investment advisor.  Those documents, which were finally received by the trustee on May 11, 2015, were at best only partially responsive to only three of the trustee's longstanding document requests, and failed in any way to explain the lop-sided property division.

9.   The Richard Musgrave Bypass Trust therefore brings this action both to correct the improprieties in the property division that are apparent based on the documents that have been made available to the trustee, and to compel production of additional documents related to the Bypass Trust that have been withheld.

**PARTIES**

10. Plaintiff Harry Krause is the current trustee of the Bypass Trust. He was named as a co-successor trustee in the original trust document, and he agreed to serve as trustee shortly after Defendant Peggy's Musgrave's resignation in May 2014. He is also a beneficiary of the Bypass Trust. Harry Krause resides in Vero Beach, Florida.

11. Defendant Peggy Musgrave is the widow of Richard A. Musgrave and served as trustee of the Bypass Trust since Richard Musgrave's death in January 2007 until her resignation in May 2014. Peggy Musgrave resides in Santa Cruz, California.

12. Defendant Pamela Clyne is Peggy's daughter, and Richard's step-daughter. Pamela Clyne was appointed as co-trustee of the Bypass Trust in or around August 2013, and resigned in May 2014. As co-trustee, Pamela prepared and filed California and Federal tax returns on behalf of the Bypass Trust, and otherwise assisted Peggy with trust administration. As one of Peggy's heirs, Pamela has a substantial interest in the outcome of this case. Pamela Clyne is married to James Clyne, a retired judge. Pamela Clyne resides in New Egypt, New Jersey.

13. Defendant Dennis Book was Richard and Peggy's estate planning attorney, and represented Peggy Musgrave in her capacity as trustee from the inception of the Bypass Trust in January 2007, until, on information and belief, he was terminated by Peggy in 2009. Dennis Book resides in Santa Cruz, California.

14. Defendant Book & Book, LLP is a Santa Cruz law firm. Defendant Dennis Book is a principal of Defendant Book & Book, LLP.

15.  Plaintiff is unaware of the true identity, nature, and capacity of each of the defendants herein designated as DOES 1 through 10, inclusive.  On information and belief, each of the defendants designated herein as a DOE is in some manner responsible for the actions, damages, and injuries alleged in this complaint.  Upon learning the true identity, nature, and capacity of the DOE defendants, Plaintiff will amend this complaint to allege their true names and capacities.

## JURISDICTION

16.  Trustee Harry Krause is a citizen of Florida.  Defendants Peggy Musgrave and Dennis Book are citizens of California, Defendant Book & Book, LLP is a California law firm, and Defendant Pamela Clyne is a citizen of New Jersey.  The amount in controversy exceeds the sum of $75,000.00, in the aggregate and as to each defendant, exclusive of interest and costs.  Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

## INTRADISTRICT ASSIGNMENT

17. A substantial part of the events or omissions which give rise to the claims herein occurred in Santa Cruz county.  In addition, Defendants Peggy Musgrave and Dennis Book reside in Santa Cruz county.  Accordingly, this case should be assigned to the San Jose Division.  Civil L.R. 3-2(c), (e).

## VENUE

18. Venue is also proper in this Court.

## FACTUAL BACKGROUND

### Background of the Parties

19. Richard and Peggy Musgrave were married in or around 1967, when Richard was about 57, and Peggy was about 43.  At that time, Richard was an internationally prominent economist

COMPLAINT - 5

and head of the Economics Department at Johns Hopkins University.  Peggy Musgrave was a graduate student in Richard's department.

20. Richard had been married once before, but had no children.  Peggy had been married once before, and had three children: Pamela Richman (now Pamela Clyne), Roger Richman, and Thomas Richman.  At the time of Richard and Peggy's marriage, Peggy's children were teenagers.  Only Thomas Richman, the youngest, who was about 13 when Peggy and Richard were married, spent significant time living in Richard and Peggy's household.

21. Richard's only sibling was Ellen Abel Musgrave, who died in 1988.  Ellen's children are Harry Krause, Angela Feddersen, Beate Eisenfuehr, and Detlev Dorendorf.  These are Richard's nephews and nieces.  Harry Krause's three sons – Philip, Thomas, and Peter – are among Richard's grandnephews and grandnieces.

22. Richard was born in Germany in December 1910.  He received his degree in economics from the University of Heidelberg in Germany. In or around 1934, Richard emigrated to America, where he further pursued his studies, and became a professor of economics.

23.  In 1951, Richard was teaching economics at the University of Michigan at Ann Arbor. He arranged for Harry Krause (his nephew, his only sister's eldest son, then 19, and studying in Germany) to come to America and enroll as an undergraduate at the University of Michigan.

24. Harry, whose father had died in 1941, came to America, and lived with Richard while attending the University of Michigan.  Richard became a surrogate father and mentor to Harry. Richard and Harry enjoyed a deep lifetime bond based on their close family relationship, camaraderie, and mutual professional respect.

**Estate Planning Background**

25. Prior to 2002, Richard and Peggy each had a separate trust, each of which contained assets in that spouse's name.

26. In early 2002, Richard wrote a letter to Defendant Dennis Book seeking estate planning advice and legal services.  In that letter, dated January 5, 2002, Richard explained:

> Our goal, as we discussed, is to (1) leave the survivor with use of the estate to meet her (his) needs, (2) to keep the format of percentage distribution of bequests at second death, (3) to take advantage of both exemptions, and (4) to have our two family lawyers to serve as trustees but to see the details of bequests at second death only.

The two family lawyers referred to were Harry Krause and James Clyne.

27. Richard's January 5, 2002 letter included "Summary of Finances" itemizing the couple's assets, for both Peggy and Richard.

28. The Summary of Finances indicated that (1) Richard had $1,320,481 in CA tax exempts and U.S. bonds in his name; (2) Richard had an IRA worth $45,035 in his name; (3) Richard had insurance worth $67,525 in his name; and (4) Richard had two pensions in his name, one worth $14,796 per year, and the other worth $45,153 per year.  There was an indication that payment of benefits for both pensions would continue for Peggy's lifetime, after Richard's death.

29. Thus, Richard had assets worth approximately $1,430,000 in his name, as well as the right to approximately $60,000 per year for the rest of his life and Peggy's from his pensions.

30. The Summary of Finances attached to Richard's January 5, 2002 letter listed assets in Peggy's name as follows: (1) an account as "Trustee" with Salomon Smith Barney worth $782,004, (2) an IRA worth $206,626, and (3) a life insurance policy worth $50,000.

31. Thus, there were assets worth approximately $1,038,000 in Peggy's name.

32. For Peggy's $50,000 life insurance policy, there was an annotation:  "To be transferred to the trust?"

33. The Summary of Finances attached to Richard's January 5, 2002 letter indicated jointly-held real estate valued at $173,600 (Vermont) and $300,000 (Santa Cruz).  Assuming a 50-50 split, this meant that Richard and Peggy each had equal shares of $236,800 in real estate holdings.

34. Mr. Book evaluated Richard and Peggy's existing estate plan and found it deficient. Specifically, in a letter dated January 18, 2002, Mr. Book explained that under the existing plan "[t]here is no legal guarantee that the one-half (1/2) share of the assets of the first spouse to die will pass to the heirs they desire."  Mr. Book's proposal implicitly rejected Richard's original suggestion as outlined in paragraph 26 above, but was intended to effectuate the same result.

35. In a January 31, 2002 letter to Richard and Peggy, Mr. Book reiterated that a primary purpose of his work would be to ensure that each spouse "could feel confident that the one-half (1/2) interest of the first to die would be distributed as desired."

36. After correspondence and meetings with Richard and Peggy in January-March 2002, Mr. Book prepared, and the parties executed, a "Declaration of Trust."  Along with the Declaration of Trust, the Parties signed a "Marital Property Declaration" and a "Comprehensive Transfer Agreement."  Exhibit 1.

37. The Declaration of Trust provided for an original, revocable trust, which would contain the couple's assets, with the exception of:

> tax favored assets on which recognition of income has been deferred including but not limited to IRAs, Roth IRAs, qualified plans under IRC §401(a), tax sheltered annuities, and nonqualified deferred compensation.

38. More specifically, the Declaration of Trust contained the following provision regarding the intended contents of the trust:

> After this trust is duly executed, we will execute and deliver all deeds, assignments, bills of sale, written instructions and other legal documents necessary to convey and register all of our assets that we choose to place in trust under this trust to be owned by the trustee(s) of this trust and held and administered under the terms and conditions of this trust. Assets which are evidenced by titles or deeds currently being transferred to the trustee(s) of this trust are listed on Schedule A, which is attached to this trust and made a part of this trust. We hereby transfer to this trust all assets not requiring titles or deeds, including but not limited to our furniture, wearing apparel, and personal possessions. Additionally, the trustor(s) are now holding and will hold, solely and exclusively for and on behalf of such trust, any and all properties of all kinds, whether presently owned or hereafter acquired including, bank accounts, certificates of deposit, mutual and money market funds of all kinds, securities, agency and custody accounts, notes, and real estate wherever located, but not including tax favored assets on which recognition of income has been deferred including but not limited to IRAs, Roth IRAs, qualified plans under IRC §401(a), tax sheltered annuities, and nonqualified deferred compensation.

39. The only assets clearly indicated by the January 5 Summary of Finances as qualifying for the "tax deferred" exclusion were IRAs held by Richard, then worth approximately $45,035, and IRAs held by Peggy worth approximately $206,626. On information and belief, Peggy's $782,004 account with Salomon Smith Barney in 2002 included an AIG annuity with a value in excess of $500,000.

40. In an April 4, 2002 letter to Richard and Peggy, Mr. Book explained that these sorts of assets (i.e. "Pension, Profit Sharing, Benefits, IRS and similar types of retirement accounts") "should name each other as primary beneficiary in order to preserve maximum tax flexibility," and that "[t]he Trust should be named as the secondary beneficiary." On information and belief, Richard and Peggy followed this instruction for these sorts of assets.

41. The Declaration of Trust provided that:

> 1. Upon the death of the first spouse, the Trustee (s) shall distribute $50,000.00 each to PAMELA CLYNE, ROGER RICHMAN, THOMAS RICHMAN and HARRY CRAUSE

[sic; Krause]. In the event any of the aforementioned do not survive the first spouse to die, their gift shall lapse.

If Peggy is the first to die, the Trustee (s) shall distribute the sum of $20,000.00, in her name, to Newnham College, Cambridge University, England, $20,000 to Derek Brewer if living and $20,000 to Alison Brewer Pizzey, if living. If Richard is the first to die, the Trustee (s) shall distribute the sum of $20,000.00 to Harvard University, to be added to the Holtzer Fellowship Fund, provided however, if this fund is not active, Harvard is directed to use the money to provide a fellowship for a German graduate student in economics.

2. The surviving trustor's share of the net proceeds of this trust shall remain in the living trust with the surviving trustor as primary trustee and primary beneficiary. Debts of decedent-trustor, debts of this trust, and expenses of the last illness and funeral expenses of the decedent-trustor shall be paid from decedent-trustor's share. After said expenses are paid, our trustee(s) shall divide the decedent-trustor's share of net proceeds of this living trust into separate shares, hereinafter referred to as the Marital Deduction Share and the Non-Marital Share. Our trustee(s) may divide community property in a non pro rata manner and shall take into account any written agreement between the trustor [sic] providing for a non pro rata division of their community property and the effect of such agreement on community property passing outside the trust.  The trustee(s) shall have the discretion to select the assets to be allocated, but such assets as are selected shall be valued as hereinafter provided.

42. As indicated in the preceding paragraph, the Declaration of Trust provided that upon the death of the first spouse, the "survivor's share" of the trust assets would stay in the "living trust," which would remain revocable, and the remainder would be placed in a "Marital Deduction Share," and a "Non-Marital Share," according to the terms of the trust.

43. The "Marital Deduction Share" contemplated the formation of a so-called QTIP trust.  If the money remaining after taking the survivor's share exceeded a certain amount, formation of the QTIP trust would serve to minimize estate taxes.  If the money remaining did not exceed that amount, then the Marital Share would be zero dollars, and the QTIP trust would not be funded. In this case, the QTIP trust was not funded.

44. After determining the Marital Deduction Share, and, if appropriate, forming the QTIP trust, the remaining assets would become the "Non-Marital Share."  The Non-Marital Share

(which would contain the decedent's share of the couple's assets) would be used to fund an irrevocable "Bypass Trust."

45. The surviving spouse was to be the sole trustee of both the original trust and the Bypass Trust.

46. The Declaration of Trust indicated that the co-successor trustees of both trusts were to be James Clyne (Peggy Musgrave's son-in-law and Pamela Clyne's husband) and Harry Krause (Richard's nephew), both of whom were attorneys.

47. The Declaration of Trust was drafted symmetrically with respect to the spouses, such that the Bypass Trust would hold the assets of the first person to die, regardless of whether that person was Richard or Peggy.

48. The documents executed in connection with the Declaration of Trust included a Marital Property Declaration, signed by Richard and Peggy on April 3, 2002.

49. In a February 27, 2002 letter to the Musgraves, Mr. Book described the purpose of the Marital Property Declaration as follows:

> Marital Property Deduction [sic; "Declaration"]. This document is intended to document that your property is in fact, community property. This may be important for distribution and tax reasons discussed in my earlier correspondence to you.

50. The Marital Property Declaration, in its entirety, read as follows:

> We, Richard A. Musgrave ("Richard") and Peggy B. Musgrave ("Peggy"), husband and wife, feel it is important to set forth the character of our properties, and do hereby acknowledge, declare, and agree as follows:

> > 1. Richard hereby declares that all property owned by him is the community property of himself and Peggy, notwithstanding the form in which title is held to such property and any such property that may heretofore have been his separate property is transmuted to community property.

> > 2. Peggy hereby declares that all property owned by her is the community property of herself and Richard, notwithstanding the form in which title is held to

such property and any such property that may heretofore have been her separate property is transmuted to community property.

3. We both hereby declare that upon the execution of this declaration all real or personal property owned by either of us or both of us, notwithstanding the form in which title is held to such property, shall be owned by us in equal shares as our community property, and if any such property was heretofore our separate property, it is hereby transmuted to community property.

4. All real and personal property owned by or standing in the name of either Richard or Peggy or in both of our names and whether held jointly by us of record, in joint tenancy, in tenancy in common, or otherwise on the date of this declaration and any property subsequently acquired out of such property is and shall constitute our community property for all legal purposes. We do not intend to change the character of the ownership of our property by holding it in joint tenancy or such other forms. If we use such forms for holding title, it is for convenience only.

5. All property subsequently acquired by Richard or Peggy, except property acquired by gift or inheritance by either of us, or property when acquired which is identified in writing as the separate property of the acquiring spouse, shall be our community property regardless of how title to the property is held.

51. Under the terms of the marital property agreement, to the extent any of the assets making up the approximately $1,430,000 in Richard's name or the approximately $1,038,000 in Peggy's name constituted Richard or Peggy's separate property, they were transmuted into community property. Thus, to the extent Peggy's IRA, life insurance, and AIG annuity might have been Peggy's separate property prior to this agreement, they were no longer her separate property after this agreement. Put simply, in exchange for obtaining a clear half-share of the approximately $1,430,000 in assets that were in Richard's name (*i.e.* about $715,000), Peggy gave Richard a clear half-share of the approximately $1,038,000 in assets that were in her name (*i.e.* about $519,000).

52. The couple also executed a "Comprehensive Transfer Document," which provided:

the undersigned are now holding and will hold, solely and exclusively for and in behalf of such trust, the following: any and all properties of all kinds, whether presently owned or hereafter acquired (regardless of the names by which acquired) including, without limitation (except as specifically excepted herein):

> bank accounts, certificates of deposit, mutual and money market funds of all kinds, securities, agency and custody accounts, notes, real estate wherever located (including mortgages, contract for deed interests, leaseholds and mineral interests), household furniture and fixtures, jewelry, antiques, and any and all other assets wherever located.

All such property is hereby transferred to and the same shall be owned by such trust.

Tax-favored assets on which recognition of income has been deferred including but not limited to IRAs, Roth IRAs, qualified plans under IRC §401(a), tax sheltered annuities, and qualified deferred compensation shall not be included pursuant to this comprehensive transfer document, and shall not be deemed to be transferred to the trust.

This declaration shall apply even though record ownership or title, in some instances, may, presently or in the future, be registered in the individual name or names of either of us, in which event such record ownership shall hereafter be deemed held in trust even though such trusteeship remains undisclosed.

53. In a letter dated April 4, 2002 and enclosing an "estate planning book," Mr. Book wrote:

In order to integrate your present life insurance policies into your estate plan, life insurance policies owned by you as your community property should name the Trust as beneficiary as follows:

> Trustee(s) as named in the Richard A. Musgrave and Peggy B. Musgrave, Trustees of the Richard and Peggy Musgrave Revocable Trust dated April 3, 2002.

Each of you may be named as secondary beneficiary of life insurance policies on the other's life, so that if the Trust is not in existence at the first of your deaths, the proceeds will be payable to the survivor of you. The actual ownership of the life insurance policy is not changed, just the beneficiary designation.

54. Among other things, the April 4, 2002 letter reflected the parties' understanding that each spouse had a community share in the other's life insurance policies. On information and belief, Richard and Peggy followed this instruction for their life insurance assets.

55. The trust was amended three times before Richard's death in 2007. In the final amendment before Richard's death (the Third Amendment, dated March 30, 2006), Richard's beneficiaries were set forth as follows: (1) Two charities would receive a total of 20% of the residual estate (Doctors Without Borders USA and Alzheimer's Disease Research (now Brightfocus) would each receive 10%); (2) Harry Krause would receive 20% of the residual estate; (3) Beate Eisenfuehr, Angela Feddersen, and Detlev Dorendorf would each receive 12%, and (4) Philip, Thomas, and Peter Krause would each receive 8%. The amendment also had provisions to deal with the contingency that a beneficiary might not survive the survivor of Richard and Peggy.

**Events Leading Up To Property Division**

**Events Involving The AIG And MetLife Assets**

56. On February 6, 2007, Kevin Mize, Richard and Peggy's investment advisor, then of CitiGroup Smith Barney, faxed Dennis Book a list of assets. The list of assets indicated that, at the time of Richard's death, the trust included an AIG annuity, valued at $560,392.49, and a MetLife insurance policy, valued at $80,861.48. Printouts dated January 17, 2007 – the day after Richard's death – placed the January 16, 2007 value of these assets at $569,971.37 ("contract value") and $81,423.47, respectively.

57. Based on the CitiGroup Smith Barney statements, up until Richard's death, Richard had every reason to assume that the AIG annuity and the MetLife insurance policy were in the trust, and that his share in those assets would pass to his heirs and beneficiaries after his death, consistent with the couple's agreement that all of their assets would be shared equally, regardless of how titled.

58. On information and belief, in spite of the couple's agreement that all of their assets were community property, Peggy sold the AIG annuity after Richard's death and bought in its place, in her own name, an Allstate annuity having approximately the same value.  In her March 20, 2007 application for the Allstate annuity, Peggy listed the "The Survivor's Trust of the Richard and Peggy Musgrave Trust 04/03/2002" – *i.e.* essentially herself and her heirs – as the primary beneficiary. The primary beneficiary of the AIG annuity had been Richard, with the couple's joint trust as the contingent beneficiary.

59. On information and belief, sometime between February 6, 2007 and November 6, 2007 the MetLife insurance policy was sold.

60. A November 7, 2007 CitiGroup Smith Barney Statement of trust assets lists a MetLife Insurance policy valued at $83,922.83, as of Nov. 1, 2007.  The MetLife insurance policy listed in the November 7, 2007 statement (the "second MetLife insurance policy") has a different account number than the MetLife insurance policy listed in the statement provided by Mr. Mize on February 6, 2007 (the "first MetLife insurance policy").

61. On information and belief, the proceeds of the sale of the first Metlife insurance policy were used to purchase the second MetLife insurance policy.

62. On information and belief, the beneficiary designation for the second Metlife insurance policy differed from the beneficiary designation of the first Metlife insurance policy.

63. The November 7, 2007 CitiGroup Smith Barney Statement indicates that the Allstate Annuity was valued at $593,577.80 as of Nov. 1, 2007, and was considered in the trust.

64. As indicated below (in paragraph 82), in the property division, "annuities" having a value of $560,392 (which corresponds to a time-of-death value for the AIG annuity) were considered "Outside of Trust" and Richard's Bypass Trust received no share of that value.

**Events Involving The Riversource Life Insurance Asset**

65. Shortly after Richard's death, Peggy contacted the Riversource Insurance company regarding a life insurance policy in Richard's name, valued at $82,105 at Richard's death, which named the trust as a beneficiary.

66. In a letter dated March 6, 2007, Dennis Book sent the Riversource Insurance company various documents that it had requested in a January 18, 2007 letter to Peggy regarding Richard's life insurance policy.  These documents included (1) a notarized copy of Richard's death certificate; (2) a certified copy of the Richard and Peggy Musgrave Revocable Trust; (3) an IRS Form W9 listing the EIN for the Richard and Peggy Musgrave Revocable Trust, and (4) a Certification of Trust signed by Peggy B. Musgrave with Trustee(s)' Powers attached.

67. On information and belief, sometime after March 6, 2007, Dennis Book received, on behalf of the trust, $82,105 from the Riversource Insurance company.

**Events Involving The Beneficiaries**

68. In May 2007, Dennis Book sent checks for $50,000 to each of Roger Richman, Pamela Clyne, Thomas Richman, and Harry Krause, and a check for $20,000 to Harvard University, drawn on Peggy's "Financial Management Account" with Salomon Smith Barney.

69. Harry Krause wrote a letter on June 4, 2007 to  Dennis Book acknowledging receipt of his $50,000 check.  In the  letter, Harry noted that Richard "had at various times discussed with me his overall estate plan which in essence would provide that his funds would of course be in the first line available for Peggy's needs, but that after her passing, the remainder would, among other likely bequests, go to members of his sister's family, *i.e.* my sisters, brother and myself and perhaps my sons with whom he was close."  Harry asked Mr. Book to provide him any information about Richard's estate to which Harry was entitled.

70. Harry Krause received no response to his June 4, 2007 letter. He sent additional letters requesting the same information on July 3, 2007 and July 20, 2007.

71. In a letter to Harry Krause dated July 24, 2007, Dennis Book enclosed a copy of the Declaration of Trust, including the Third Amendment. No further information regarding the trust was provided.

72. Dennis Book's July 24, 2007 letter made no mention of Richard's will.

73. On information and belief, neither Peggy, Pamela, nor Mr. Book ever informed the charities Doctors Without Borders and Alzheimer's Disease Research (now Brightfocus) that they were beneficiaries of Richard's trust.

74. The information related to the Property Division set forth below was not made known to Harry or any other of Richard's beneficiaries until July 2014, after Harry had become trustee.

**The Property Division**

75. On or about March 8, 2008, the Bypass Trust was finally funded.

76. The Bypass Trust's initial "share" (prior to deductions discussed below) was determined by (1) determining the value of the assets deemed within the living trust at the time of Richard's death ($2,678,545); (2) determining that Richard's half-share of this $2,678,545 (i.e. $1,339,273) was equivalent to 72% of the "stock" holdings (*i.e.* everything other than cash, royalties, or real estate) at time of death; (3) funding the Bypass Trust with 72% of the "stock" holdings as of the date of the property division ($1,514,466.00), and then (4) deducting the full amount of the distributions to Peggy's children, Harry, and Harvard University ($220,000), the expenses associated with Richard's memorial service ($10,382), the full amount of attorney's fees associated with the property division ($20,000), and appraisal fees ($750). This left $1,263,334.00 to be allocated to Bypass Trust.

77. The remainder of the money that was in the living trust at the time of the property division – $1,566,626 – was thus considered Peggy's share.

78. There was no contemporaneous written explanation of why the $220,000 in distributions to Peggy's children, Harry, and Harvard were charged solely to the Bypass Trust, in spite of the fact that the Declaration of Trust clearly indicated that this amount was to be subtracted before the Bypass Trust was funded.

79. There was no contemporaneous written explanation of the $52,000-plus disparity between Richard's starting share, prior to deductions ($1,514,466) and Peggy's starting share ($1,566,626).

80. A statement issued by CitiGroup Smith Barney indicated that the Allstate annuity and Richard's Riversource life insurance policy were all in the trust at the time of Richard's death. At the time of the property division, a statement produced by Dennis Book's law firm (Exhibit A to a "Memorandum of Allocation" dated March 8, 2008) indicated that the decedent – Richard – had a half-share of each of these assets, and that each decedent had a half-share of the couple's $62,500 in personalty and in Peggy's $211,386 in IRAs.

81. Nevertheless, the Memorandum of Allocation stated that "[s]everal assets were held outside of the trust, with each of Richard and Peggy naming the other the designated beneficiary of said assets."

82. Exhibit B to the Memorandum of Allocation listed the "Assets Outside of Trust" as follows:

| | |
|---|---|
| IRAs | $245,835.00 |
| Annuities | $560,392.00 |
| Life Insurance | $82,105.00 |
| Personalty | $62,500.00 |
| | $950,832.00 |

83. The Memorandum of Allocation provides no explanation of why the $62,500 in personalty was considered to be "Outside of Trust" even though the Comprehensive Transfer Document (paragraph 52, above) and the Declaration of Trust itself (paragraph 38, above) clearly specify that all personalty was trust property.

84. The Memorandum of Allocation provides no explanation of why the $82,105 in life insurance – an amount equal to that obtained on behalf of the trust from the Riversource Insurance Company (see paragraphs 65-66 above) – was considered "Outside of Trust."

85. The Memorandum of Allocation provides no explanation of why the $560,392.00 "Annuities" was considered "Outside of Trust," in view of the facts that the AIG annuity was in the trust at the time of Richard's death, and the Allstate Annuity was purchased with trust assets, and was in fact indicated as being in the trust in November 2007.

86. Assuming that some or all of these assets – the annuity, the insurance proceeds, the personalty, and the IRAs – were properly considered outside the trust, Richard nevertheless had a community share in the annuity, the insurance proceeds, the personalty, and Peggy's IRAs under California law and under the Marital Property Declaration.  Upon Richard's death, those community shares continued to belong to Richard.  Calif. Probate Code § 100 ("Upon the death of a married person, one-half of the community property belongs to the surviving spouse and the other half belongs to the decedent.").

87. The Memorandum of Allocation states that "The Bypass Trust shall consist of the balance of the Trust Estate representing the balance of the Deceased Spouse's interest in the community property and the balance of the Deceased Spouse's separate property included in the Trust Estate."  Despite this statement, Richard's community property interests in the assets that

were considered "Outside of Trust" did not find their way into the Bypass Trust, and were not

otherwise accounted for in the property division.

88. The Memorandum of Allocation contains no explanation of what happened to Richard

Musgrave's community share of any of the assets listed in Exhibit B, and does not address how

those assets should have been treated pursuant to Richard's will.

89. Richard's will stated as follows:

> 3.1 Disposition to the Trust. I give all my interest in the residue of my estate, including
> all my intangible property and tangible personal property and my interest in my
> residences, to the Trustees of the Trust, to be held in trust. All property passing to the
> Trustees of the Trust shall immediately be added to and merged with and into the Trust to
> the same effect as if the property were an asset of the Trust at my death. All property
> added to the Trust shall be held, administered, allocated, and distributed according to its
> terms, including any amendments made to the Trust during my lifetime.

90. Richard's will was never filed with any court, in violation of Calif. Probate Code § 8200.

91. The terms of the Richard's will were not followed, inasmuch as there was no accounting

for Richard's community share of the assets that were characterized by the Memorandum of

Allocation as "Outside of Trust."

92. On information and belief, Peggy was aware that the $82,105 life insurance proceeds

from Richard's life insurance policy was supposed to stay in the trust, and that Richard had a

half-share in those proceeds, and yet Peggy improperly appropriated the full amount of those

proceeds for herself. Dennis Book was likewise aware that the $82,105 life insurance proceeds

from Richard's life insurance policy was supposed to stay in the trust. Dennis Book aided and

abetted Peggy in this misappropriation by allowing these life insurance proceeds to pass wholly

to Peggy outside the trust.

93. On information and belief, Peggy was aware that the couple's $62,500 in personalty was

in the trust, and that Richard owned a half-share of that personalty, and yet Peggy improperly

appropriated the full amount of that property for herself.  Dennis Book was likewise aware that the couple's $62,500 in personalty was in the trust, and that Richard owned a half-share of that personalty.  Dennis Book aided and abetted Peggy in this misappropriation by allowing the personalty to pass wholly to Peggy outside the trust.

94. On information and belief, Peggy was aware that Richard owned a half-share of the $560,392 AIG annuity (which later became the Allstate annuity), and yet appropriated the full amount of the annuity for herself.  Dennis Book was likewise aware that Richard owned a half-share of the $560,392 AIG annuity, and aided and abetted Peggy in this misappropriation by allowing the annuity to pass wholly to Peggy outside the trust.

95. The Memorandum of Allocation and the property division also took no account of several education accounts held by Peggy for her grandchildren and great-grandchild.  These accounts, totaling $185,943.76, were in Peggy's name.  Richard's community share in these accounts was $92,971.88.  While Richard may well have wished to provide for the education of Peggy's grandchildren and great-grandchild, he did so on the assumption that after his death, there would be a 50-50 property division.  Richard did not relinquish his community share in the education accounts.

96. The Memorandum of Allocation stated that Peggy was entitled to income from the Bypass Trust, as follows:

> i. Such amount of net income from the Bypass Trust, as needed for the health, maintenance and support in accordance with his or her accustomed standard of living shall be distributed currently to the Surviving Spouse in quarter-annual or more frequent installments.

97. The foregoing quoted paragraph from the Memorandum of Allocation is flatly inconsistent with the terms of the Declaration of Trust.  The Declaration of Trust addresses distributions to Peggy as follows:

> The survivor of us shall be the trustee of the Bypass Trust and, during the surviving trustor's lifetime, this trust shall be administered for the benefit of the surviving spouse as hereinafter provided, Upon the death of either of us, the plan of distribution and all terms of this Bypass Trust shall become unamendable and irrevocable. The trustee shall pay to or use for the benefit of the surviving trustor so much of the net income and principal of the Bypass Trust as the trustee shall deem necessary for the health, education, maintenance, or support of the surviving trustor, taking into consideration all other means available to the surviving trustor for such purposes from all sources known to our trustee.

98. To the extent that, during the period between Richard's death and the property division, Peggy received income distributions from assets that ultimately went into the Bypass Trust, those distributions were improper.

99. The Declaration of Trust sets forth certain amounts that were to come out of the decedent trustor's share at the time the Bypass Trust was to be funded.  Those amounts were "debts of the decedent-trustor, debts of this trust, and expenses of the last illness and funeral expenses."  The Declaration of Trust is silent on how attorney's fees and appraisal fees are to be paid; i.e. whether they are to be paid by the survivor's trust, the decedent's trust, or shared between them.

100.    The Book law firm charged $20,000 for its work relating to the property division. This amount was charged solely to the Bypass Trust.

101.    Appraisal fees for the properties in the amount of $750 were charged solely to the Bypass Trust.

### Events Occurring After The Property Division

102.    In or around Fall 2008, Peggy mentioned to Harry that she no longer wished to serve as Trustee of the Bypass Trust, and offered to resign in favor of Harry.

103.    Harry Krause first received a statement of the Bypass Trust's holdings in or around November 2008.  Upon examination of this statement, it became apparent to Harry that Peggy was paying herself the income of the Bypass Trust, on a quarterly basis.

104.    Harry Krause and Thomas Krause examined the Declaration of Trust document in or around January 2009.  They concluded that under the operative paragraph – reproduced in paragraph 97 above – Peggy was not entitled to the income, except as "deem[ed] necessary for the health, education, maintenance, or support of the surviving trustor, taking into consideration all other means available to the surviving trustor."

105.    Harry wrote to Mr. Book on January 29, 2009, explaining his basis for believing that it was improper for Peggy to be taking the income from the Bypass Trust.

106.    Over the months of January, February, and March 2009, Harry and Peggy exchanged several letters, in which Harry took the position that Peggy was not entitled to the Bypass Trust's income, whereas Peggy contended that she was.  During this period, Harry received no response from Mr. Book to his January 29, 2009 letter.

107.    Mr. Book finally weighed in with a letter dated April 3, 2009.  In that letter, Mr. Book agreed with Harry Krause that Peggy was not entitled to the Bypass Trust income on an unrestricted basis.

108.    Mr. Book's letter stated that Peggy had changed her mind about turning over the trusteeship to Harry.  Mr. Book also wrote:

> When the time comes for Peggy to no longer act as Trustee, it is felt it would be fair if you were the sole trustee over the Richard Musgrave Bypass Trust and Mr. Clyne the sole trustee over Peggy's Trust.  In that regard, enclosed is a declination for you to act as Successor Trustee of the Peggy Musgrave Trust. Please sign and return to me. A similar declination to act as Successor Trustee of the Richard Musgrave Bypass Trust is being signed by Mr. Clyne.

109.    In an April 17, 2009 letter to Mr. Book, Harry told Mr. Book that he did not feel comfortable resigning as co-successor trustee for the Peggy Musgrave Trust, because "Richard clearly intended that I serve in that position."

110.    In a December 14, 2009 email, Peggy informed Harry that she had discussed the trusts with James Clyne (her son-in-law), and that Mr. Clyne had "advised [her] to jettison Mr. Book, especially after he met him." She reported that her "new lawyer told me that the Trusts written by Book were unprofessional and poorly executed," and that the new lawyer had redrafted her survivor's trust. She "blame[d] Mr. Book for the sloppy way he wrote the Trust agreement," and "begrudge[d] every penny that Richard paid him for his poor work." She did not indicate whether or not Harry remained a co-successor trustee on the survivor's trust.

111.    As co-successor trustee of Peggy's original survivor's trust, Harry would have, upon Peggy's death, received information about the March 2008 property division, including the fact that Peggy had received approximately 70% of the couple's assets in that property division.

112.    On information and belief, Peggy's redrafted trust did not name Harry Krause as co-successor trustee.

113.    By having her survivor's trust revised to remove Harry as successor trustee, Peggy made it less likely that Harry would ever receive information about the March 2008 property division.

114.    In or around August 2013, Peggy appointed her daughter, Pamela Clyne, as a co-trustee of the Bypass Trust. The appointment was prepared by attorney Minda Parrish, and Peggy paid Minda Parrish $1,975 out of Bypass Trust funds for the appointment. There was no notice to the beneficiaries of the Bypass Trust that this step had been taken.

115.    Harry first noticed that Pamela Clyne had been appointed as co-trustee when reviewing a Morgan Stanley statement in or around Fall 2013.

116.    Between January 20 and February 12, 2014 Pamela and Harry spoke on the phone regarding a possible agreement to dissolve the Bypass Trust.  Pamela indicated that Peggy had appointed her as co-trustee because Peggy did not feel capable of continuing to carry out the burdens of trusteeship by herself.  Pamela proposed that Peggy would relinquish any interest she might have in the interest and principal of the Bypass Trust in exchange for a lump sum payment, and that the Bypass Trust could be dissolved without a transfer of trusteeship.

117.    On February 12, 2014, Harry wrote a letter to Pamela Clyne setting forth three options, including the lump sum payment option suggested by Pam.

118.    On April 9, 2014 Peggy wrote to Harry, proposing the following arrangement:

> After a number of investigations, I understand that in cases such as this it is usual for the trustee-custodian to be reimbursed at a rate of 1.00 percent of the value of the Trust each year.  However I would be willing to take one-half of this amount, i.e equal to 0.5 percent of the Trust's market value.

> My calculations place this total amount at around 3 percent of its current value (plus a much smaller sum for Pam's service as the tax agent).

> In return I would renounce all authority over the BT which would pass to you, or whomever you wish.

119.    On April 14, Harry Krause responded to Peggy Musgrave's April 9 email.  In the response, he wrote:

> As you say, your proposal needs to be put into legal terms. To avoid any further doubts regarding my own sincerity in this whole matter, I suggest that you have your attorney draft a clear contract embodying your offer and forward the proposal to me.  Thomas and I then would review it and, if need be, comment and obtain the consent of all beneficiaries, including of course the two charities. I would also suggest that the whole trust then be liquidated as soon as possible, as there would be no further need for it. That could all be part of the same transaction. As I have said many times, I never sought and

do not now seek to have anything more to do with the matter than absolutely necessary to ensure the appropriate unwinding of the trust.

120.    On April 15, 2014, Pamela Clyne outlined a proposed agreement as follows:

My understanding of your e-mail and Mom's e-mail is that you both agree to:

1.    Dissolve and distribute the Bypass Trust.

2.    Compensate Mom for her 7 years a Trustee at a rate of .5 (one half) percent per year of the value of the trust. (We can get these figures from Kevin)

3.    Mom will give up all further rights to any compensation.

4.    I will be reimbursed for my cost of purchasing tax programs for the past two years in order to prepare the trust returns. ($200 per year - $400 total)

121.    Later on April 15, 2014 Pamela Clyne wrote Harry Krause, reporting that she had spoken to Minda Parrish, who had said that dissolving the Bypass Trust "would not be complicated as long as everyone is in agreement," and that the fee for doing so would be "between 6 and 7 thousand dollars for the whole process," although "[s]he will, of course, have to confirm this with Mom before proceeding."

122.    Pamela and Harry agreed that the proposed agreement to dissolve the Bypass Trust would be further discussed in a conversation with Minda Parrish, to be held on April 17, 2014.

123.    If the Bypass Trust had been dissolved as Peggy and Pam proposed, then Harry most likely would never have received any information about the March 2008 property division.

124.    On the morning of the planned conversation with Ms. Parrish (on April 17, 2014), Pamela wrote to say that Ms. Parrish was not willing to dissolve the Bypass Trust but instead "could transfer the trusteeship to you instead of dissolving it."  Pamela indicated that this would be "much less expensive," and that "Jim will resign and you could move the trust to Florida so as

to pay no state tax," and that "Mom is in agreement and will step down once she receives her trustee pmt."

125.     Later that day, a conference call took place between Minda Parrish, Pamela Clyne, Harry Krause, and Thomas Krause.  Peggy Musgrave was unable to join due to technical difficulties.  In that conference call, Ms. Parrish stated that she was unwilling to act as attorney to dissolve the Bypass Trust, because doing so would present a "conflict of interest."  Although Harry indicated that he did not see the conflict of interest given that Ms. Parrish had been attorney for the trustee of the Bypass Trust for several years, and that the beneficiaries would likely in any event be willing to waive any conflict of interest, Ms. Parrish was adamant.

126.     In discussing the idea of compensating Peggy with over $40,000 in exchange for her relinquishment, Ms. Parrish stated that Peggy was entitled to pay herself the $40,000 as trustee fees, regardless of any relinquishment.

127.     In response to a question from Harry or Thomas, Ms. Parrish characterized the Bypass Trust beneficiaries as "mere remaindermen."

128.     Ms. Parrish proposed that she would draft a relinquishment by Peggy for Harry and Thomas's review.  Thomas and Harry expressed doubt that any relinquishment without dissolution would be satisfactory, but agreed to review what Ms. Parrish came up with.

129.     On April 18, 2014, Peggy left a voicemail for Harry, saying, among other things, that "I'm no longer fit to . . . no longer well enough to deal with the trusteeship and that I want to pass it on to you and Jim."

130.     Ms. Parrish never sent a draft relinquishment to Harry and Thomas.

131.     Instead, on or about May 21, 2014, Ms. Parrish sent Harry a letter indicating that Peggy had relinquished her interest in the trust, that James Clyne had declined to act, that Peggy

and Pam had both resigned as trustees, and that Peggy had paid herself $44,371.52 from the trust as trustee fees covering the period 2007-2014.  The letter gave Harry the opportunity to accept the trusteeship as successor trustee to Peggy and Pamela.

132.    Harry accepted the trusteeship.

133.    Harry subsequently made contact with the charitable beneficiaries of the Bypass Trust – Doctors Without Borders USA, and Brightfocus (formerly Alzheimer's Disease Research).  In conversations with representatives of these charities, Harry learned that they had not been informed of the existence of the trust or their status as beneficiaries.

134.    Harry wrote to Minda Parrish on June 5, 2014 asking for relevant documents and for an accounting.

135.    In response, Minda Parrish stated that an accounting would cost approximately $8000.

136.    Harry wrote back to Ms. Parrish on June 11, 2014, reiterating the request for relevant documents.

137.    On June 25, 2014 Minda Parrish sent documents purporting to be her complete file on the matter, as well as files she had received from Dennis Book, to Harry's Champaign Illinois residential address, despite Harry's having told her to send the documents to his office address. Harry received these documents at his home in Florida several weeks later.

138.    The receipt of Dennis Book's files from Ms. Parrish marked the first time Harry received any information about the March 2008 property division.  On cursory examination of the files, Harry realized that in the property division, Peggy had received or retained over $1 million more of the couple's joint assets than Richard did.  Harry turned the files over to his son, Thomas, an attorney, for review.

139.     Based on his review, Thomas prepared a lengthy memorandum on issues raised by the documents received from Ms. Parrish (the "Sept. 20 Memo").  The Memorandum included a set of 11 specific document requests, and pointed out that an easy way for Peggy to comply with those requests would be for her to simply turn her files relating to the Bypass Trust over for copying. The Sept. 20 Memo (without its 25 Exhibits), is attached as Exhibit 2 to this Complaint.

140.     Harry sent a copy of the Sept. 20 Memo and its attachments to Minda Parrish and Peggy Musgrave on September 22, 2014.  He sent electronic versions of the Sept. 20 Memo and its attachments to Ms. Parrish and Ms. Musgrave on September 30, 2014.

141.     In a letter dated October 2, 2014, Ms. Parrish wrote Harry to say that she no longer represented Peggy Musgrave.

142.     Thomas forwarded the Sept. 20 Memo and its attachments, including the document requests, to predecessor trustee Pamela Clyne on October 5, 2014, and suggested that the parties jointly contact Dennis Book in order to get his explanation for the discrepancies and issues raised in the Sept. 20 Memo.

143.     On October 8, 2014 Thomas and James Clyne had a conversation about the matter, in which mutual cooperation was pledged, although the parties agreed that the contents of the conversation were subject to the settlement privilege and could not be used as evidence.  In that conversation, Thomas reiterated the need for the documents responsive to the documents requests attached to the Sept. 20 Memo.

144.     Despite Thomas's request that the parties jointly contact Dennis Book, Pamela Clyne contacted Mr. Book unilaterally.  On information and belief, Pamela Clyne gave Dennis Book false and/or misleading information about Richard's heirs and beneficiaries.  Subsequent to this unilateral contact, Dennis Book has shown great reluctance to cooperate with the trustee in this

matter, and specifically refused to speak with either Harry or Thomas Krause, and has repeatedly failed to respond to emails.  Eventually, Mr. Book consented to a single interview with the Bypass Trust trustee's then-attorney, but provided no opportunity for follow up, despite repeated requests.

145.    On October 9, 2014, James Clyne wrote to Thomas promising a "more detailed email within the next couple days."

146.    No such "more detailed email" was ever received.  Thomas checked in with James Clyne by email on October 20, 23, and 29, 2014.  On October 29, 2014 James Clyne responded by leaving Thomas a voicemail stating that Roger Richman's attorney, Chris McPhillips, had done a detailed analysis of the Sept. 20 Memo, and was prepared to discuss it.

147.    On November 10, 2014, Harry Krause wrote a letter to Mr. Book asking for a copy of Richard's pour over will (which had been missing from the files forwarded by Minda Parrish), and a response to the September 20, 2014 memo, by the end of the month of November, 2014.

148.    On November 13, 2014 Thomas had a conversation with Chris McPhillips, in which various aspects of the dispute were discussed.  Mr. McPhillips made it clear that he was not representing Peggy at that time.  He raised various evidentiary points, and stated that Peggy's side would likely have a claim for "elder abuse" against Harry.  In that conversation, Thomas reiterated the need for documents responsive to the requests attached to the Sept. 20 Memo.

149.    In a November 18 email to James Clyne enclosing Harry's November 10 letter to Mr. Book, Thomas asked Mr. Clyne to confirm that he would be able to provide documents responsive to the original document requests, as well as additional documents mentioned by Chris McPhillips, by December 1, 2014.

150.     Over the period November 19 - December 4, 2014 Thomas and Mr. McPhillips exchanged several emails.  Thomas sought to establish who, if anyone spoke for Peggy, but Mr. McPhillips failed to answer that question. In an email to James Clyne, dated December 4, 2014, on which Thomas Krause was copied, Mr. McPhillips suggested that James Clyne take out UCC-1 liens on Harry Krause's residences in Florida and Illinois, and that in his opinion, Harry Krause's past correspondence with Peggy Musgrave constituted both elder abuse and undue influence.

151.     Dennis Book provided no response to Harry's November 10 letter before the December 1 deadline set by that letter.  On December 3, 2014 Thomas Krause left a voicemail for Dennis Book, and on December 4, Thomas Krause sent an email to Dennis Book, cc'g Dennis Book's law partners.

152.     Likewise, James Clyne provided no response to Thomas's letter asking for confirmation that he would be able to respond to the original document requests by December 1, 2014.

153.     Thomas wrote to James Clyne again on December 5, 2014 expressing dissatisfaction with Mr. McPhillips's response, asking for a response as to who would speak on behalf of Peggy, and asking when he could expect to receive a response to the document requests included with the Sept. 20 Memo.

154.     The only response was a response from Pamela Clyne, as follows:

Thomas,

My husbands brother was taken off life support yesterday. My husband is sitting with him while he dies.
Stop harassing him with e-mails.

You are already killing my mother.
Please don't insult me with a response that you care.

Pam

155.    On December 8, 2014, Mr. Book provided Thomas Krause a copy of Richard's will by email.  Mr. Book did not provide a written response to the issues raised in the Sept. 20 letter, and (as mentioned in paragraph 144 above), eventually consented to only a single interview with the Bypass Trust trustee's then-attorney, and only on condition that neither Thomas or Harry attend that interview.

156.    On December 23, 2014, James Clyne sent Thomas Krause an email suggesting that if any settlement were to occur, it should be before the end of December, at which time James and Pamela Clyne would be visiting Peggy in California.

157.    On December 26, 2014, Thomas Krause wrote back to James Clyne.  Among other points, Thomas explained that "it would be difficult to make significant progress without some response to our outstanding document requests."

158.    Later that day, Thomas and James Clyne had a conversation in which Thomas reiterated the need for documents.

159.    On December 28, 2014, Thomas sent an email to James Clyne, cc'g Pamela and Roger.  This email again reiterated the need for documents.

160.    On December 28, 2014 former co-trustee Pamela Clyne responded to Thomas's email.  Among other things, Pamela's email stated that:

The gifts to your father, myself, and my brothers were specifically intended as gifts from him at his death. My mother has a letter from him to this effect. He gave us that instead of a percentage of his Bypass Trust. Mr Book also had specific instructions from Richard regarding this transfer.

161.    On December 30, Thomas wrote back to Pamela, observing (among other things) that the "letter" that Pam said her mother had

> is very much the sort of document we were hoping to see in response to the document requests ("Any other documents in Peggy's, Pam's or their lawyers' or advisers' possession that shed light on the issues raised in this memorandum.").  It sounds like it might be relevant not only to the question of the intent of the gifts, but also to Richard's intent in not giving you a percentage of the Bypass Trust. I do not know if such a letter would be legally dispositive – since the trust language itself is pretty clear – but if it was signed by Richard, it will go a long way in settlement negotiations.

162.    Neither the letter described by Pamela as being in Peggy's possession, nor the "instructions" purportedly given to Mr. Book by Richard, appeared in the copy of Mr. Book's files that Minda Parrish forwarded to Harry Krause.

163.    As of the date of the filing of this Complaint, and despite repeated requests since December 30, 2014, the letter described by Pamela has not been produced.

164.    Pamela's December 28, 2014 email also stated:

> I saved Richards paintings and belongings and gave them all to you.
> His other "personality" [sic] was donated to charity and indeed, Mom had to pay to have stuff hauled away. She never asked you to pay part of the cost and yet you want "half of the clothes off her back".

165.    Neither Thomas nor Harry have ever requested any portion of the clothes off Peggy's back.

166.    The paintings referred to in Pamela's email were paintings that Richard had painted as a hobby, and which had been stored in Pamela's barn and/or shed.  At Peggy's invitation and with Pamela's acquiescence, Thomas Krause and Philip Krause had retrieved the paintings in March 2012, and distributed them to members of Richard's family.

167.    On January 1, 2015, Pamela emailed Thomas stating (among other things) "I don't have as much time as you apparently do, so lets just turn this over to attorneys who can separate truth from fiction."

168.    On January 5, 2015, Thomas, a beneficiary of the trust, acting on behalf of trustee Harry Krause, wrote back requesting that Pamela:

> tell your lawyer that we've been waiting for a response to our document requests, not to mention a response to the Sept. 20 memo itself, for over three months.  We are now insisting on a response by February 1.

169.    On January 5, 2015, Pam wrote back, in full:

> You have no authority to "insist" on anything.

> Get an attorney!

170.    In a letter dated January 12, 2015 and emailed to Harry Krause on January 13, 2015, Stephen Picone informed Harry that he was Peggy's attorney and that he would be providing a response to Thomas's Sept. 20 Memorandum.

171.    On January 14, 2015 Harry responded to Mr. Picone, stating (among other things):

> It will be difficult, however, to have a comprehensive discussion of the merits of the case without a response to our document requests.  Those requests were attached to Thomas's Sept. 20 memorandum (of which you have a copy), and we have reiterated them in writing several times since then, but have received no response.  Most recently, we asked for a response by February 1.  Please let me know when you think you will be able to gather and produce the requested documents.   If some documents are easier to retrieve than others, we are happy to accept responses on a piecemeal basis; the most important requests are those concerning the annuity (Requests 2 and 3), as well as the catch-all request for other relevant documents (Request 11).  I believe that I am entitled to all of the requested documents as both a beneficiary and trustee, but if you have a different view, please let me know.

172.    On or about January 27, 2015, Mr. Book met with Lawrence Brenner, Harry's then-attorney in his capacity of trustee of the Bypass Trust.  In that discussion, Mr. Book acknowledged that the Riversource insurance proceeds should not have been removed from the

trust, and acknowledged the Bypass Trust's arguments as to the personalty and at least $200,000 of the $220,000 distributions.  Mr. Book maintained, however, that it was proper for the annuity and Peggy's IRA to pass solely to Peggy.  Mr. Book subsequently failed to respond to numerous requests for documents and a follow up conversation.

173.    In emails dated February 3, February 12, and February 23, 2015, Thomas and Harry reiterated the request for documents to Mr. Picone.

174.    In a letter dated March 10, 2015 and emailed to Harry on March 12, 2015, Mr. Picone responded to the some of the issues raised in the Sept. 20 Memo.  In that letter, Mr. Picone stated:

> Also I understand that you are seeking to review certain documents that you claim to be in Peggy's actual or constructive possession. Consequently, could you please give me a precise list of the documents that you are seeking?

175.    Thomas and Harry responded on March 17, 2015.  In that response, Harry and Thomas reiterated the need for documents responsive to the document requests included with the Sept. 20 memo, and specifically asked for

> a copy of all of Peggy's files relating to the Trust, and the Trust Assets.  The documents should include, but not be limited to, the specific documents itemized in the original request for documents (copy attached again, for your added convenience), as well as any documents that substantiate the points made in your letter, and should include any and all documents that you have reviewed in connection with this case.

176.    No response to that letter was received as of April 13, 2015.  On April 13, 2015, Mr. Picone was sent a draft of this complaint, along with a cover letter that explained that unless progress was made towards a settlement and/or compliance with the longstanding document requests, the complaint would be filed on Monday April 20, 2015.

177.    Mr. Picone arranged for a conversation between himself, Thomas, Harry, attorney Erin Kolko (of Temmerman, Cilley, and Kohlmann, representing Harry in his capacity as trustee

of the Bypass Trust), and Peggy's and Richard's investment adviser Kevin Mize on April 21, 2015.  In that conversation, Mr. Mize indicated that he had a considerable number of documents relating to various assets of Richard's and Peggy's, and that he had ordered still more.

178.   On May 11, 2015, Thomas received a letter from Mr. Mize attaching documents whose release had been authorized by Peggy and Pam.  The documents themselves consisted of a total of 24 pages.

179.   Apart from these 24 pages of documents, as of the date of the filing of this complaint, neither Peggy, Pamela, not their representatives have provided any documents in response to the document requests included with the Sept. 20, 2014 memo, or in response to any of the numerous subsequent requests.  There has been no response to Thomas's December 30, 2014 (and later-repeated) request for the letter identified by Pam in her December 28, 2014 email (see paragraphs 160-161 above), and there has likewise been no response to Harry's March 17 request for a copy of all of Peggy's files (see paragraph 175 above).

## CAUSES OF ACTION

### Count One: Breach of Fiduciary Duty By Failure to Conduct Equal Property Division

180.   Plaintiff incorporates and realleges paragraphs 1-179 above.

181.   As trustee of the Bypass Trust, Peggy had a fiduciary duty to the Bypass Trust's beneficiaries.  The duty of a trustee to her fiduciaries was aptly described by Justice (then-Judge) Cardozo as follows:

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by

the 'disintegrating erosion' of particular exceptions. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

Cord v. Smith, 338 F.2d 516, 524-25 (9th Cir. 1064) (quoting Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, J.)).

182.   The plain intent of Richard and Peggy's estate plan was (1) to share all of their assets 50-50, and (2) to ensure that each spouse's half-share of the assets would go to the heirs and beneficiaries of that person's choosing.  Consistent with that plan, California community property law, and by operation of the couple's marital agreement, half of the assets in Richard's name belonged to Peggy, and half of the assets in Peggy's name belonged to Richard.

183.   As trustee of the Bypass Trust, Peggy had a fiduciary duty to the remainder beneficiaries of the Bypass Trust to ensure that the couple's intent regarding a 50-50 property division was faithfully carried out.

184.   Nevertheless, after the property division in March 2008, rather than a 50-50 split, the assets were split approximately 70-30 in Peggy's favor.

185.   A fair division, consistent with the parties' estate planning intent, could have been achieved by (i) adding up the couple's assets at time of death ($3,815,121), (ii) subtracting charges that should been charged to the joint estate – $220,000 for the distributions to Peggy's children, Harry, and Harvard; $20,000 for attorney fees; and $750 for appraisal fees – ($3,574,371), dividing by two ($1,787,185), applying the Book law firm's appreciation factor of 1.131 to account for appreciation between time of death and time of property division ($2,021,306), and subtracting $10,382 for the expenses associated with Richard's memorial service ($2,010,924).  The $2,010,924 represents a floor value for Richard's half-share of the (known) joint estate as of the time of property division, after deduction of expenses chargeable to

Richard's side.  This is also a conservative estimate, because it does not take into account the fact that money used for distributions, attorney's fees, and appraisal fees remained in the trust for varying periods after Richard's death, and was subject to appreciation.

186.     As a result of Peggy's property division, Richard's Bypass Trust only received $1,263,344.  The difference between that figure and the half-share floor value calculated in the preceding paragraph was  $747,580.

187.     In the property division, Peggy received $1,566,626 in trust assets, plus $950,832.00 in assets considered "outside of trust," for a total of $2,517,458.  She also remained the owner of her grandchildren's and great-grandchild's education funds, valued at $185,944 at the time of Richard's death, bringing her total "share" to $2,703,402.  This is a substantial underestimate, because it does not include appreciation on the $950,832 that was held outside the trust, or on the education funds.  Thus, as a result of the property division, Peggy's share of the couple's joint assets exceeded Richard's by at least $1,440,058.

188.      The large disparities between Richard's half-share floor value and the share Richard actually received ($2,010,924 - $1,263,344 = $747,580), and between Peggy's share (even omitting significant appreciation) and Richard's share ($2,703,402 - $1,263,344 = $1,440,558) create a strong inference that Richard and Peggy's estate planning intent of equal shares for each spouse was not followed.  The failure to follow the original estate planning intent constituted a breach of fiduciary duty.

### Count Two: Breach of Fiduciary Duty as to Individual Assets

189.     Plaintiff incorporates and realleges paragraphs 1-188 above.

190.     The lopsided property division resulted from several specific misappropriations and misallocations by Peggy and Mr. Book.  First, Peggy and Mr. Book improperly removed the

$82,105 proceeds from Richard's life insurance policy from the joint trust, despite the fact that Peggy and Mr. Book had applied for those funds on behalf of the joint trust, and despite the fact that the Bypass Trust should clearly have received a half-share of those proceeds.

191. Second, Peggy and Mr. Book improperly removed the couple's $62,500 in personalty from the joint trust, and neither Peggy nor Mr. Book made any effort to compensate the Bypass Trust for Richard's half-share of the couple's personalty.

192. Third, Peggy and Mr. Book improperly removed from the joint trust $560,392.00, representing the value of the AIG annuity at the time of Richard's death, even though the AIG annuity was in the trust at the time of Richard's death, and despite the fact that even if this asset were outside the trust, Richard had a community share in it that should have been accounted for in the property division, or, failing such an accounting, should have gone back into the Bypass Trust by operation of Richard's pour over will.

193. Fourth, Peggy and Mr. Book improperly allocated all of Peggy's $211,386 in IRAs to Peggy, despite the facts that (1) these assets were listed as jointly-held assets in Mr. Book's listing of the couple's assets, and (2) Richard had a community share in them that should have been accounted for in the property division, or gone back into the trust by operation of Richard's pour over will.

194. Fifth, Peggy and Mr. Book improperly allocated the full $220,000 in distributions (to Peggy's three children, Harry, and Harvard) to the Bypass Trust, thereby decreasing the Bypass Trust by that amount, despite the fact that the plain language of the Declaration of Trust makes it clear that the gifts were to be paid prior to the funding of the Bypass Trust.

195. Sixth, Peggy and Mr. Book wholly failed to take into account Richard's half-share of the approximately $186,000 in education accounts held by Peggy on behalf of her grandchildren.

196.     Seventh, even apart from the money and valuable personalty that was considered to be outside the trust, and which went solely to Peggy, Peggy's Survivor's trust was initially funded with $1,566,626, as compared to $1,514,466 for the Bypass Trust (before deductions). There is no explanation for this disparity, and it cannot be reconciled with the language of the trust or the settlors' intent.

197.     Eighth, in violation of the express terms of the trust, Peggy received income from all of the trust assets during the period between Richard's death and the property division.

### Count Three:  Breach of Trust

198.     Plaintiff incorporates and realleges paragraphs 1-197 above.

199.     Peggy Musgrave's conduct of the property division contravened the terms of the Bypass Trust and the settlors' intent.

### Count Four:  Failure To Administer the Trust According to Its Terms

200.     Plaintiff incorporates and realleges paragraphs 1-199 above.

201.     Under California Probate Code § 16000, Peggy Musgrave was required to "administer the trust according to the trust instrument."

202.     In the property division, despite the plain language of the Declaration of Trust requiring that the $220,000 in distributions – $150,000 of which went to Peggy's children – be taken from the joint trust prior to the funding of the Bypass Trust, Peggy charged the full $220,000 to the Bypass Trust.

203.     In the property division, despite the fact that the language of the trust does not address attorney's fees or appraisal fees, Peggy charged the full amount of those fees to the Bypass trust.

204.     During the period between Richard's death and the property division, Peggy was credited with income from Richard's share of the assets, in violation of the terms of the trust.

205.    In the property division, despite the plain language of the trust, and the incorporated Comprehensive Transfer Document, specifically providing that the couple's personalty was to be held in the trust, Peggy allowed the couple's $62,500 personalty to pass directly to her, outside the trust, without compensating the Bypass trust for Richard's half-share of the personalty.

### Count Five:  Conversion

206.    Plaintiff incorporates and realleges paragraphs 1-205 above.

207.    As a result of Peggy Musgrave's failure to properly allocate the distribution of $220,000 in gifts equally between the Bypass Trust and the Survivor's Trust, the Bypass trust received $110,000 less, and the Survivor's Trust received $110,000 more, than they would have received had the language of the Declaration of Trust been followed.

208.    As a result of Peggy Musgrave's failure to properly allocate the distribution of $20,750 in attorney's fees and appraisal fees equally between the Bypass Trust and the Survivor's Trust, the Bypass trust received $10,375 less, and the Survivor's Trust received $10,375 more, than they would have received had the language of the Declaration of Trust been followed.

209.    As a result of Peggy Musgrave's failure to follow the express terms of the trust regarding the couple's $62,500 personalty, the Bypass Trust received $31,250 less than it should have.

210.    As a result of Peggy's improper removal of the $82,105 proceeds of Richard Musgrave's Riversource life insurance policy from the trust, the Bypass Trust received $41,052 less than it should have.

211.    The sale of the $560,392.49 AIG annuity, which was in the trust and/or was half-owned by Richard, and the use of the proceeds from that sale to purchase an asset – the Allstate

annuity – that was subsequently taken out of the trust for the sole benefit of Peggy constituted conversion.

212.    By failing to account for Richard Musgrave's community share in various jointly-owned assets, including Peggy Musgrave's IRAs, the annuity, the couple's personalty, the education accounts, and the proceeds from Richard's life insurance policy, Peggy appropriated the entireties of these assets for herself in the property division.  These misappropriations amounted to conversion.

213.    The improper allocation of deductions for gifts, attorney's fees, and appraisals solely to the Bypass Trust amounted to conversion.

214.    The appropriation of income on Richard's share of the couple's assets during the period between Richard's death and the property division amounted to conversion.

### Count Six:  Unjust Enrichment

215.    Plaintiff incorporates and realleges paragraphs 1-214 above.

216.    As a result of Peggy's failure to conduct a proper property division, Peggy has been unjustly enriched.

### Count Seven:  Bad Faith, Wrongful Taking and/or Concealment of Property Belonging to Richard's Trust and/or Estate (Calif. Probate Code § 859)

217.    Plaintiff incorporates and realleges paragraphs 1-216 above.

California Probate Code § 859 provides:

If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a . . . a trust, or the estate of a decedent . . . the person shall be liable for twice the value of the property recovered by an action under this part.  In addition, except as otherwise required by law, . . . the person may, in the court's discretion, be liable for reasonable attorney's fees and costs. The remedies provided in this section shall be in addition to any other

remedies available in law to a person authorized to bring an action
pursuant to this part.

218.    Peggy's removal from the trust of the jointly-owned AIG annuity, and the sale of that asset and the use of the sale's proceeds to purchase of a new asset (the Allstate annuity) for the sole benefit of Peggy was wrongful and in bad faith, as was the failure to account for Richard's community share in this asset in the property division.

219.    Peggy's removal from the trust of the jointly-owned proceeds from Richard's life insurance policy, for the sole benefit of Peggy, was wrongful and in bad faith, as was the failure to account for Richard's community share in this asset in the property division.

220.    Peggy's removal from the trust of the couple's jointly-owned personalty, for the sole benefit of Peggy, was wrongful and in bad faith, as was the failure to account for Richard's community share in the personalty in the property division.

221.    Peggy's subsequent concealment, from 2008-2014 of the removal of these assets from the trust, was wrongful and in bad faith.

222.    Peggy's failure to correct the obvious errors brought to her attention, including the misappropriation of the AIG/Allstate annuity, Peggy's IRAs, the personalty, and Richard's insurance proceeds, was wrongful and in bad faith.

223.    Peggy's wrongful and bad faith actions recited in the preceding paragraphs in this Count warrant double damages relief under California Probate Code § 859.

### Count Eight:  Breach of Statutory and Fiduciary Duty Through Improper Withholding of Documents and Information

224.    Plaintiff incorporates and realleges paragraphs 1-223 above.

225.    In September 2014, trustee Harry Krause sent predecessor trustee Peggy Musgrave, specific requests for information and documents.  In addition to being requests from a successor

trustee to a predecessor trustee for relevant information, those requests were also "reasonable request[s] . . . for information relating to the administration of the trust relevant to the beneficiary's interest" under California Probate Code § 16061, thereby triggering a duty to respond within 60 days under California Probate Code § 17200(b)(7)(B).

226.    The September 2014 requests were reiterated and elaborated upon on numerous occasions between September 2014 and the present, to James Clyne (who had requested that all communications with Peggy be through him), to former co-trustee Pamela Clyne, and to Peggy Musgrave's counsel, Stephen Picone.  The information that Harry Krause has received in response to these requests – a total of 24 pages of documents relating to beneficiary designations on certain assets, received on May 11, 2015 – has been woefully incomplete and has necessitated the bringing of this lawsuit.

### Count Nine:  Excessive Trustee Compensation

227.    Plaintiff incorporates and realleges paragraphs 1-226 above.

228.    Under Probate Code § 17200(b)(9), the Court can review the reasonableness of the trustee's compensation.

229.    Over the period January 2007 - May 2014, Peggy did not take any trustee fees.

230.    In May 2014, without notice to the beneficiaries, Peggy paid herself $44,371.52 in trustee fees.

231.    In view of the various breaches of fiduciary duty and other torts set forth herein, and Peggy's continued failure to cooperate with the current trustee, the $44,371.52 in trustee fees were excessive.

**Count Ten:  Breach of Fiduciary Duty Through Improper
Withholding of Documents and Information, and Obstruction of
Trustee's Attempts To Obtain Information (Defendant Pamela Clyne)**

232.    Plaintiff incorporates and realleges paragraphs 1-231 above.

233.    On information and belief, in October 2014 Defendant Pamela Clyne was in possession of documents or copies of documents from Peggy's files relating to the Bypass Trust.

234.    In October 2014, beneficiary Thomas Krause, acting on behalf of trustee Harry Krause, sent predecessor trustee Pamela Clyne the same specific requests for information and documents that Harry Krause had sent to Peggy Musgrave.  In addition to being requests from a successor trustee to a predecessor trustee for relevant information, those requests were also "reasonable request[s] . . . for information relating to the administration of the trust relevant to the beneficiary's interest" under California Probate Code § 16061, thereby triggering a duty to respond within 60 days under  California Probate Code § 17200(b)(7)(B).

235.    Those requests were reiterated on several occasions to Pamela Clyne.

236.    In response to a request "insisting" on a deadline of January 31 for document production, Pamela Clyne responded "you have no right to insist on anything."

237.    Until a copy of a draft of this complaint was sent to Peggy's attorney, Pamela Clyne provided no response whatsoever to the document requests.

238.    Rather than cooperate with the trustee in contacting Mr. Book, as requested by Thomas Krause, Pamela Clyne contacted Mr. Book unilaterally and gave him false and/or misleading information that has caused Mr. Book to be unwilling to cooperate with the trustee.

**Count Eleven: Failure To Stop and/or Rectify
Trustee's Breaches of Trust (Defendant Pamela Clyne)**

239.    Plaintiff incorporates and realleges paragraphs 1-238 above.

240.     Under California Probate Code § 16013, Pamela had a duty "[t]o take reasonable steps to prevent a cotrustee [i.e. Peggy] from committing a breach of trust or to compel a cotrustee [i.e. Peggy] to redress a breach of trust," and under § 16402(b), Pamela is liable for Peggy's breaches to the extent she knowingly acquiesced in or concealed them, and to the extent she failed to take reasonable steps to rectify them, after having learned or received information about them from which she should reasonably have known of them.

241.     Pamela Clyne learned of Peggy's breaches of trust at the very latest on October 5, 2014.

242.     Since that time, Pamela Clyne has made no effort to redress those breaches, and has, in fact, obstructed the trustee's attempts to gain information about them.  Thus, Defendant Pamela Clyne failed to stop and/or rectify Peggy Musgrave's breaches of trust.

### Count Twelve:  Unjust Enrichment (Defendant Pamela Clyne)

243.     Plaintiff incorporates and realleges paragraphs 1-242 above.

244.     As a beneficiary of Peggy Musgrave's living trust, and as Peggy Musgrave's heir, Pamela Clyne has been unjustly enriched as a result of the improper property division.

### Count Thirteen:  Bad Faith, Wrongful Concealment of Property Belonging to Richard's Trust and/or Estate (Calif. Probate Code § 859) (Defendant Pamela Clyne)

245.     Plaintiff incorporates and realleges paragraphs 1-244 above.

246.     Defendant Pamela Clyne has deliberately chosen not to respond to legitimate requests by the trustee seeking information relating to the 2008 property division and specific assets that were held "outside of trust."

247.     On information and belief, Defendant Pamela Clyne has deliberately obstructed the attempts of the trustee to gain information from Dennis Book relating to the 2008 property division and specific assets that were held "outside of trust."

248.     On information and belief, Defendant Pamela Clyne has deliberately obstructed the attempts of the trustee to gain information from predecessor trustee Peggy Musgrave relating to the 2008 property division and specific assets that were held "outside of trust."

249.     Pamela Clyne's failure to respond to requests for information, and her deliberate obstruction of the trustee's attempts to get information from Dennis Book and Peggy Musgrave amount to bad faith, wrongful concealment of property belonging to Richard's trust and/or estate, and warrant an award of double damages relief under California Probate Code § 859.

**Count Fourteen:  Aiding and Abetting Breach of Fiduciary Duty,**
**Breach of Trust, and Conversion (Defendants Dennis Book and Book & Book, LLP)**

250.     Plaintiffs incorporate and reallege paragraphs 1-249 above.

251.     The elements for a claim for aiding and abetting a breach of fiduciary duty are as follows:

> (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff.

Nasrawi v. Buck Consultants LLC, 231 Cal. App. 4th 328, 343, 179 Cal. Rptr. 3d 813, 824-25 (Cal. App. 6th Dist. 2014) (citations omitted).

252.     Defendant Dennis Book, of the law firm Book & Book, LLP, as attorney for Bypass Trustee Peggy Musgrave, knew that failing to compensate the Bypass Trust for the couple's personalty, the proceeds of the Riversource Insurance policy, the Allstate/AIG annuity, and/or Peggy's IRAs were breaches of Peggy's fiduciary duties, and yet Mr. Book provided substantial

assistance or encouragement to Peggy to breach those fiduciary duties.  Mr. Book's conduct was a substantial factor in causing harm to the current trustee and plaintiff, inasmuch as (among other things) it has necessitated the filing of this lawsuit.

**Count Fifteen:  Aiding and Abetting Pamela Clyne's Breaches
of Fiduciary Duty and Failure to Stop Breach of Trust
(Defendant Dennis Book)**

253.    Plaintiffs incorporate and reallege paragraphs 1-252 above.

254.    On information and belief, Dennis Book was aware the Pamela Clyne owed a fiduciary duty to the Bypass Trust trustee.  By failing to fully cooperate with trustee Harry Krause's requests for information, Defendant Dennis Book aided and abetted Pamela Clyne in breaching her fiduciary duty, and in her failure to stop Peggy Musgrave's breach of trust.  Defendant Dennis Book's failure to cooperate was a substantial factor in the need for the Bypass Trust trustee's filing of this lawsuit.

**Count Sixteen:  Legal Malpractice (Defendant Dennis Book and Book & Book, LLP)**

255.    Plaintiff incorporates and realleges paragraphs 1-254 above.

256.    Dennis Book, of the law firm Book & Book, LLP, served as the attorney for Peggy Musgrave, in her capacities as trustee of the joint trust and as trustee of the Bypass Trust, during the period 2007-2009, including during the property division that occurred in March 2008.  Accordingly, Mr. Book had a duty to the office of the Bypass Trust trustee to conduct the property division in a non-negligent manner.

257.    Although Mr. Book assured Richard and Peggy that the first of them to die could be certain that his or her half-share of the couple's assets would go to his or her heirs and beneficiaries, and drafted the couple's estate planning documents accordingly, Mr. Book conducted a property division that resulted an approximately 70-30 split of the couple's assets in

favor of Peggy (and her heirs and beneficiaries), with Peggy's share of the couple's joint estate exceeding Richard's by more than $1.4 million.

258. Mr. Book committed several specific errors during the property division including improperly failing to compensate the Bypass Trust for Richard's shares of (1) the proceeds of Richard's Riversource life insurance policy, (2) the AIG and/or Allstate Annuity, (3) the couple's $62,500 in personalty, and (4) Peggy's IRAs.

259. Mr. Book also improperly charged the full $220,000 in distributions made to Peggy's children, Harry, and Harvard against Richard's share, despite plain language in the trust to the contrary. Mr. Book likewise improperly charged the full amount of the attorney's fees and the full amount of the appraisal fees against Richard's share.

260. To the extent that the errors in the property division were not made knowingly, they were the product of negligence.

## Count Seventeen:  Violation of Calif. Probate Code § 8200
### (Defendants Dennis Book and Book & Book, LLP)

261. Plaintiff incorporates and realleges paragraphs 1-260 above.

262. California Probate Code § 8200 requires that

(a) Unless a petition for probate of the will is earlier filed, the custodian of a will shall, within 30 days after having knowledge of the death of the testator, do both of the following:   (1) Deliver the will to the clerk of the superior court of the county in which the estate of the decedent may be administered.   (2) Mail a copy of the will to the person named in the will as executor, if the person's whereabouts is known to the custodian, or if not, to a person named in the will as a beneficiary, if the person's whereabouts is known to the custodian.

(b) A custodian of a will who fails to comply with the requirements of this section shall be liable for all damages sustained by any person injured by the failure.

263. For purposes of § 8200, as Richard and Peggy's estate planning attorney, Dennis Book was the custodian of Richard Musgrave's will.

264.    Defendant Dennis Book failed to deliver Richard Musgrave's will to the clerk of the applicable superior court within 30 days of Richard's death, as required by § 8200.

265.    As a result of this failure, Richard's community share of assets that were considered "Outside of Trust" went to Peggy and her heirs, instead of to Richard's Bypass Trust, and the current Bypass Trustee has found it necessary to bring this lawsuit to correct the mistakes made in the property division.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests this Court to enter Judgment against Defendants Peggy Musgrave, Pamela Clyne, and Dennis Book, and issue an order:

a.   Declaring that Peggy Musgrave breached her fiduciary duty with respect to her responsibilities regarding the Richard Musgrave Bypass Trust.

b.   Declaring that Peggy Musgrave's trustee fees were excessive.

c.   Declaring that Pamela Clyne breached her fiduciary duty with respect to her responsibilities regarding the Richard Musgrave Bypass Trust.

d.   Declaring that Dennis Book aided and abetted Peggy Musgrave in her breach of her fiduciary duty to the Bypass Trust beneficiaries.

e.   Declaring that Dennis Book and Book & Book, LLP committed legal malpractice by handing the property division in a negligent manner.

f.   Declaring Dennis Book and Book & Book, LLP liable for all damages sustained by the Bypass Trust and its beneficiaries as a result of his failure to deliver Richard Musgrave's will to the clerk of the applicable superior court within 30 days of Richard's death, as required by California Probate Code § 8200.

g.  Declaring that Peggy Musgrave wrongfully and in bad faith misappropriated and concealed property that belonged to the Richard Musgrave Bypass Trust and/or Richard Musgrave's estate.

h.  Declaring that Pamela Clyne wrongfully and in bad faith concealed property that belonged to the Richard Musgrave Bypass Trust and/or Richard Musgrave's estate.

i.  Requiring Peggy Musgrave to produce a copy of all documents in her possession or constructive possession that are relevant to the Bypass Trust to Harry D. Krause, including, but not limited to, copies of her complete files relating to the original joint trust, the property division, and the Bypass Trust, including the documents specifically requested in the document requests that were attached to the Sept. 20, 2014 Memo.  The documents produced should include all communications, including electronic communications, regarding the Bypass Trust and/or the 2008 property division, with each and every one of the following individuals:  Dennis Book, Chris McPhillips, Kevin Mize, Minda Parrish, Pamela Clyne, James Clyne, Roger Richman, and Thomas Richman. The documents should include copies of all files held by Peggy's investment advisor Kevin Mize relating to this matter, including, but not limited to, all correspondence between Kevin Mize and any of the aforementioned individuals relating to this matter, all monthly statements of accounts held by Richard, Peggy, or Richard and Peggy from the period of February 2002 to April 2008, and all documents that Kevin Mize procured in connection with and after the April 21, 2015 conference call described in paragraph 177 above.

j.   Requiring Peggy Musgrave to pay and transfer to the successor Trustee, Harry Krause, an amount sufficient to compensate the Bypass Trust for the damages occasioned by her breaches of fiduciary duty, breach of trust, and conversion, and to remedy any additional losses sustained as a result of her actions.  The amount should be at least $747,580 – representing the difference between the share allocated to the Bypass Trust in the property division, and the share that the Bypass Trust would have received from a proper property division.

k.   Requiring Peggy Musgrave, pursuant to California Probate Code § 859, to pay and transfer to the successor trustee an additional amount equal to the value of Richard's shares of the Allstate annuity, Richard's life insurance proceeds, and Richard and Peggy's personalty.   That additional amount is at least $398,336, representing the value of Richard's half-share of these assets at time of death ($352,498) multiplied by the appreciation factor (1.131) used by Mr. Book to take into account appreciation between time of death and time of property division.

l.   Requiring Peggy Musgrave to pay and transfer to the successor Trustee, Harry Krause, $44,371.52, an amount representing the excessive trustee fees that Peggy Musgrave paid herself from the Bypass Trust, without proper notice to the Bypass Trust beneficiaries, in May 2014.

m.   Requiring Defendant Pamela Clyne, to the extent the full amount of damages, interest, and attorney's fees awarded against Peggy Musgrave are not collectable from Peggy Musgrave, to pay and transfer to the successor Trustee, Harry Krause, any shortfall.

n.  Requiring Pamela Clyne to produce a copy of all documents in her possession or constructive possession that are relevant to the Bypass Trust to Harry D. Krause, including copies of her complete files relating to the original joint trust, the property division, and the Bypass Trust, including, but not limited to, the documents specifically requested in the document requests that were attached to the Sept. 20, 2014 Memo.  The documents produced should include all communications, including electronic communications, regarding the Bypass Trust and/or the 2008 property division, with each and every one of the following individuals:  Peggy Musgrave, Dennis Book, Chris McPhillips, Kevin Mize, Minda Parrish, James Clyne, Roger Richman, and Thomas Richman. The documents should also include all monthly statements of accounts held by Richard, Peggy, or Richard and Peggy from the period of December 2006 to April 2008.

o.  Requiring Defendant Dennis Book, to the extent the full amount of damages, interest, and attorney's fees awarded against Peggy Musgrave and/or Pamela Clyne are not collectable from Peggy Musgrave and/or Pamela Clyne, to pay and transfer to the successor Trustee, Harry Krause, any shortfall.

p.  Requiring Defendant Dennis Book, to the extent the full amount of damages, interest, and attorney's fees awarded against and collectable from Peggy Musgrave and Pamela Clyne are not sufficient to compensate the Bypass Trust and its beneficiaries for all damages sustained as a result of Mr. Book's failure to file Richard's will with the applicable superior court, to pay and transfer to the successor Trustee, Harry Krause, any shortfall.

q.   Awarding  pre-and post-judgment interest, along with reasonable attorney's fees, costs, and expenses which the Bypass Trust necessarily incurred in bringing and pressing this case.

r.   Awarding such other and further relief, including punitive damages, against Peggy Musgrave, Pamela Clyne, and Dennis Book as the Court deems proper.

Dated: May 20, 2015

Respectfully submitted,

/S/ Thomas W. Krause
Thomas W. Krause, Esq. (Pro Hac Vice Pending)
108 N. Cherry St.
Falls Church, VA 22046
Tel: 703-597-8440

TEMMERMAN, CILLEY & KOHLMANN, LLP
Robert E. Temmerman, Jr., Esq. (CA Bar No. 96175)
2502 Stevens Creek Boulevard
San Jose, CA 95128
Tel: 408-290-7210

Attorneys for Plaintiff Harry D. Krause, Trustee
Richard Musgrave Bypass Trust

COMPLAINT - 54