# EXHIBIT 2

Memorandum

From:  Thomas W. Krause
To:    Harry D. Krause, Trustee
Date:  September 20, 2014

Re:    Richard Musgrave Bypass Trust: Review of Files

You asked me to review the files that you received from Ms. Parrish in June 2014, and to advise you of any issues that I found that would be relevant to you as Trustee of the Bypass Trust. I have completed my review, and report my conclusions herein. As you know, I have consulted with a Santa Cruz trust and estates attorney at considerable length, and he agrees that these are serious issues that need to be raised with Peggy (the predecessor trustee) and Ms. Parrish (her attorney) for a full response. He also believes that this may be something that we can work out among ourselves, if we all come to agree on the governing principles of law and fairness.

By way of overview, I first review the intent of the parties, as I have been able to ascertain it from the correspondence between Richard and Peggy and Mr. Book, as well as from the documents that Mr. Book prepared in order to effectuate that intent. Next, I explain how, during the property division, neither this intent, nor the plain language of the governing documents, was followed, with the result that there were both improper deductions and improper exclusions from Richard's side of the trust. I then turn briefly to the question of reasonable trustee compensation. After that, I total what I see as the liability from Peggy's side of the trust to Richard's. Finally, I provide a brief discussion of what I believe the key issues would be, if this matter should come to litigation (a result that we should all hope to avoid).

For your convenience, I will reproduce relevant passages from pertinent documents by copying them directly into this Memorandum. For each such passage, I also provide a copy of the complete document in which it appears, for context. The documents are compiled as "Exhibits" in the attached appendix. Exhibit 1 is the Declaration of Trust dated April 3, 2002, including the third amendment dated March 30, 2006 (which replaces Section C.2 of Article 2 of the Declaration of Trust in its entirety).

As noted in various places, the conclusions I reach are based on the documents available to me. Peggy might well have in her possession documents that may help clarify the issues raised in this Memorandum. At the end of this Memorandum, I have prepared a list of specific document requests that should be provided to Peggy and Ms. Parrish.

## A.    Intent of Richard, Peggy, and Mr. Book

Richard and Peggy retained Mr. Book to plan their estate in early 2002. At the outset, Richard itemized the couple's joint assets as follows:

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 2 of 36

SUMMARY OF FINANCES

Richard A. Musgrave

1. Account with Salomon Smith Barney
   (a) FBO Richard A. Musgrave, TTEE          $ 1,320,481
       (CA tax exempts and US bonds)
   (b) S.S.B. IRA  Rollover Custodian         $    45,035

2. Life Insurance, payable to "Trust"         $    67,525

3. Pensions:  TIAA $ 14, 796
              CREF  $ 45,153
   Payment of benefits to continue
   through my wife's lifetime.

Peggy B. Musgrave

1. Account with Salomon Smith Barney
   (a) FBO Peggy B.Musgrave TTEE              $   782,004
   (b) S.S.B. IRA Rollover Custodian          $   206,626
       (Equity funds and bonds)
   (c) Life Insurance
       (to be transferred to Trust?)          $    50,000

Real Estate held jointly
(title to be transferred to Trust?)

1. Hartland Four Corners, Vermont
   Mobile Home   (assessed at)               $   173,600
2. De Anza Park, Santa Cruz  (estimate)       $   300,000
                                                            2, 745,271

                                                          3, 875,271
                                                          w/o insurance.

Attachment to January 5, 2002 letter from Richard to Mr. Book (Exh. 2).

In a January 18, 2002 letter to the Musgraves, Mr. Book explained that their separate financial arrangements had several disadvantages, including that "There is no legal guarantee that the one-half (1/2) share of the assets of the first spouse to die will pass to the heirs they desire":

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 3 of 36

> 1.      Presently, you each have separate trusts and separate financial accounts. It appears, however, that each of you have a common desire as to how you want the property to ultimately be distributed. Having separate trusts and accounts to accomplish this common goal may present problems that could otherwise be avoided, e.g.,
>
> (a)    If one of you should die, only the assets in the decedent's trust would get a step up in basis. The basis of the surviving spouse assets would stay the same.
>
> (b)    Your present plan may not fully utilize each of your one-million dollar exemption equivalents. This has the potential of costing many unnecessary dollars in estate taxes upon the death of the second.
>
> (c)    There is no legal guarantee that the one-half (½) share of the assets of the first spouse to die will pass to the heirs they desire.

Jan. 18, 2002 letter from Mr. Book to Richard and Peggy (Exh. 3).

In a January 31, 2002 letter to Richard and Peggy, Mr. Book confirmed that a primary purpose of his work would be to ensure that each spouse could feel confident that their half-share of the couple's assets would be distributed as desired:

> 3.      With the property as community property, I would recommend that a single trust be used wherein you are each a Trustor and a Trustee. This trust could contain provisions that would ensure that the one-million exemption equivalent is fully used by each of you. It could further be drafted so that each of you could feel confident that the one-half (½) interest of the first to die would be distributed as desired. Also, since all of the property is held in one joint trust and is your designated community property, all of the property would get a step-up in basis upon the death of the first spouse.

January 31, 2002 Letter from Mr. Book to Richard and Peggy (Exh. 4), at 2.

Thus, despite the fact that the majority of the assets were in Richard's name in early 2002, the couple agreed that the assets would be split 50-50, and Mr. Book's stated goal, and Richard and Peggy's intent, was to ensure that the one-half share of the estate of the first person to die would be distributed as that person wished.

In the end, even though Richard started off with the larger share of the couple's assets, only one-third of the assets (about $1.2 million of about $3.6 million) went into the Bypass Trust to be distributed as Richard desired. At first blush, one might think that Mr. Book failed miserably to accomplish the mutual and expressly-stated purpose of causing the first decedent's half-share to pass as desired. But that's not the case. Mr. Book's work was in fact carefully designed to deliver the result he promised; however, as shown below, his efforts were thwarted by a botched property division in March 2008 that featured improper exclusions and erroneous deductions amounting to more than a million dollars. While Mr. Book's firm clearly was involved in the property division, the property division does not reflect the same degree of meticulousness as Mr. Book's initial work for Richard and Peggy.

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 4 of 36

Mr. Book's work to achieve the stated goal of allowing each spouse to be confident that his or her half of the assets would be distributed as desired included several mutually-reinforcing measures:

- He had Richard and Peggy sign a Marital Property Declaration, in which both of them agreed that all of their assets – no matter how titled – were the community property of the two of them. This agreement applied to every single asset of the couple, including both preexisting and subsequently-acquired assets:

### MARITAL PROPERTY DECLARATION

We, Richard A. Musgrave ("Richard") and Peggy B. Musgrave ("Peggy"), husband and wife, feel it is important to set forth the character of our properties, and do hereby acknowledge, declare, and agree as follows:

1.    Richard hereby declares that all property owned by him is the community property of himself and Peggy, notwithstanding the form in which title is held to such property and any such property that may heretofore have been his separate property is transmuted to community property.

2.    Peggy hereby declares that all property owned by her is the community property of herself and Richard, notwithstanding the form in which title is held to such property and any such property that may heretofore have been her separate property is transmuted to community property.

3.    We both hereby declare that upon the execution of this declaration all real or personal property owned by either of us or both of us, notwithstanding the form in which title is held to such property, shall be owned by us in equal shares as our community property, and if any such property was heretofore our separate property, it is hereby transmuted to community property.

4.    All real and personal property owned by or standing in the name of either Richard or Peggy or in both of our names and whether held jointly by us of record, in joint tenancy, in tenancy in common, or otherwise on the date of this declaration and any property subsequently acquired out of such property is and shall constitute our community property for all legal purposes. We do not intend to change the character of the ownership of our property by holding it in joint tenancy or such other forms. If we use such forms for holding title, it is for convenience only.

5.    All property subsequently acquired by Richard or Peggy, except property acquired by gift or inheritance by either of us, or property when acquired which is identified in writing as the separate property of the acquiring spouse, shall be our community property regardless of how title to the property is held.

Executed on _April 3_, at Santa Cruz, California.

_Rich H. Musgrave_
RICHARD A. MUSGRAVE

_Peggy B. Musgrave_
PEGGY B. MUSGRAVE

Marital Property Declaration, April 3, 2002 (Exh. 5).

The only exclusions from this agreement are (1) subsequently-acquired property that was acquired by gift or inheritance or (2) subsequently-acquired property, which, when acquired, is identified in writing as the "separate property" of the acquiring spouse. Although (as discussed at more length below), the Declaration of Trust itself provided for an exclusion for IRAs and other tax-deferred instruments upon which income had been deferred, this Marital Property Declaration confirmed that all of the couple's assets at the time of Trust formation – including any that might have been excluded from the Trust – were the couple's community property, regardless of how titled.

In sending the draft of the Marital Property Declaration to the Musgraves, Mr. Book made it clear that he saw no reason for any property to be designated as "separate property":

> 2.      I would suggest that you enter into an agreement that your property is community property and that each of you have an undivided one-half (½) interest in all of the property. You have a thirty plus year marriage and a common goal as to the properties final disposition. For all practical purposes there is probably no reason to hold the property in any form other than community property at this point. We can further discuss this matter at our next office conference.

Jan. 31, 2002 letter from Mr. Book to Richard and Peggy (Exh. 4), at 2.

• He drafted the Declaration of Trust to contain a clause titled "Community Property Agreement" that indicates that the character of any property as either "community" or "separate" would be governed by a community property agreement entered into by the couple:

### C.   COMMUNITY PROPERTY AGREEMENT:

> We agree and declare that all property shall be classified as community or separate property by a community property agreement entered into by us now or in the future, or, if no valid community property agreement exists, then we agree that community property transferred to the trust shall remain community property throughout our marriage, and that separate property transferred to the trust shall remain separate property, unless classified otherwise by a future community property agreement. Any distribution or withdrawal of community property or separate property shall retain its character as separate property, respectively.

Decl. Trust (Exh. 1), Art. 5.C, at 22.  The Marital Property Declaration is a community property agreement that makes it clear that the couple's assets would be community property with only narrow exceptions for certain after-acquired assets. Thus, the Trust's "Community Property Agreement" provision confirms that to establish that something is separate property of one spouse, both parties would have to designate it as such in a community property agreement.

- He noted that up to $200,000 could be kept outside the Trust, but nevertheless recommended that all assets other than a household checking account be transferred to the Trust:

> b. **Bank Savings, and Other Cash Accounts.** Up to a total of $100,000 of real and personal property can be held outside the Trust in each of your individual names ( a total of $200,000 for both of you) and avoid probate. This amount of property may be collected by affidavit 40 days after your death without the need for probate administration. Thus, not all of your savings accounts, certificates of deposit, and like accounts have to be transferred to the Trust so long as the $100,000 limit is respected. However, it would be prudent and I would recommend that savings and money market accounts, certificates of deposit, and like accounts (other than a personal household checking account) be transferred into the Trust.

Letter from Mr. Book to Richard and Peggy, April 4, 2002 (Exh. 6), at 2.

- He drafted the Trust to have nearly all of the couple's assets placed into the Trust:

### *** ARTICLE THREE ***
### TRUSTOR POWERS

#### A. POWER TO FUND THE TRUST:

> After this trust is duly executed, we will execute and deliver all deeds, assignments, bills of sale, written instructions and other legal documents necessary to convey and register all of our assets that we choose to place in trust under this trust to be owned by the trustee(s) of this trust and held and administered under the terms and conditions of this trust. Assets which are evidenced by titles or deeds currently being transferred to the trustee(s) of this trust are listed on Schedule A, which is attached to this trust and made a part of this trust. We hereby transfer to this trust all assets not requiring titles or deeds, including but not limited to our furniture, wearing apparel, and personal possessions. Additionally, the trustor(s) are now holding and will hold, solely and exclusively for and on behalf of such trust, any and all properties of all kinds, whether presently owned or hereafter acquired including, bank accounts, certificates of deposit, mutual and money market funds of all kinds, securities, agency and custody accounts, notes, and real estate wherever located, but not including tax-favored assets on which recognition of income has been deferred including but not limited to IRAs, Roth IRAs, qualified plans under IRC §401(a), tax sheltered annuities, and non-qualified deferred compensation.

Decl. Trust (Exh. 1), Art. 3.A, at 9.

By operation of this aspect of the Trust Agreement, even the permitted exclusion of up to $200,000 was declared to be within the Trust: through this provision, the couple transferred to the Trust "all assets not requiring titles or deeds, including but not limited to our furniture, wearing apparel, and personal possessions." The only exclusion was for "tax-favored assets on which recognition of income has been deferred." (Again, I'll return to this exclusion below.)

- Along with the Declaration of Trust, he had the parties execute a "Comprehensive Transfer Document" (Exh. 7) to the same effect:

### COM REHENSIVE TRANSFER DOC MENT

The undersigned hereby declare that solely as trustees of and for the benefit of the revocable living trust executed by the trustors and by the initial trustees, and under the provisions of said trust agreement, the undersigned act now holding and will hold, solely and exclusively for and in behalf of such trust, the following: any and all inventories of all kinds, whether presently owned or hereafter acquired (regardless of the names by which acquired) including, without limitation (except as specifically excepted herein):

bank accounts, certificates of deposit, mutual and money market funds of all kinds, securities, agency and custody accounts, notes, real estate wherever located (including mortgages, contract for deed interests, leaseholds and mineral interests), household furniture and fixtures, jewelry, antiques, and any and all other assets wherever located.

All such property is hereby transferred to and the same shall be owned by such trust.

Tax-favored assets on which recognition of income has been deferred including but not limited to IRAs, Roth IRAs, qualified plans under IRC §401(a), tax sheltered annuities, and qualified deferred compensation shall not be included pursuant to this comprehensive transfer document, and shall not be deemed to be transferred to the trust.

This declaration shall apply even though record ownership or title, in some instances, may presently or in the future, be registered in the individual name or names of either of us, in which event such record ownership shall hereafter be deemed held in trust even though such trusteeship remains undisclosed.

The undersigned hereby affirm and declare that from and after the date hereof:

1. All properties described above will be held by the undersigned exclusively for and in behalf of said trust as true owner(s) (subject to any and all instructions from the trustee(s) of said trust), and

2. Except to the extent of beneficial interest provided to the undersigned under the terms and provisions of said trust (as now written and as the same may in the future be amended), the undersigned have and shall have no personal interest in any of the properties described above, and

3. All liabilities which relate in any way to the acquisition of or which are a lien upon any of the properties governed by this declaration, shall be borne by the trust which, pursuant to this declaration, owns such properties

This declaration of exclusive trust ownership and waiver of interest is intended to be and shall be binding upon the undersigned's heirs, legal representatives and assigns and shall be revocable only by written instrument executed by the undersigned.

After the Declaration of Trust, Marital Property Declaration, and Comprehensive Transfer Document had been executed, Mr. Book advised against holding any assets other a household checking account and the couple's automobile outside the Trust:

Except for your automobiles and a household checking account, you should not hold any assets as joint tenants. A joint tenancy will not be subject to the terms of the Trust, only frustrate your intentions, and could have adverse income and estate tax consequences.

April 4, 2002 Letter from Mr. Book to Richard and Peggy (Exh. 6) at 3.[1]

---

[1] Given the couple's Marital Property Declaration, in which the Musgraves declared all of their assets to be community property, Mr. Book's implication that the couple's checking account and

- He generated pour over wills for both Peggy and Richard. The result of this was that any tangible or intangible property owned by either of them at their death would transfer to the Trust estate. By "pouring" the decedent's share of any assets outside the Trust into the Trust, the pour over wills were designed to avoid the probate process.

In his February 27, 2002 letter to the couple, Mr. Book described the pour over wills as follows:

> **Will.** The Will is commonly referred to as a "pour over will." The Will governs the property held in your name at your death. The Will provides for the administration of that property, and directs that the property remaining after the payment of your debts, expenses of administration, and estate taxes imposed on such property be added to your Revocable Trust.

February 27, 2002 Letter from Mr. Book to Richard and Peggy (Exh. 8) at 1.

The pour over wills each contained the following provision:

### ARTICLE 3
### DISPOSITION OF RESIDUARY ESTATE

> **3.1    Disposition to the Trust.** I give all my interest in the residue of my estate, including all my intangible property and tangible personal property and my interest in my residences, to the Trustees of the Trust, to be held in trust. All property passing to the Trustees of the Trust shall immediately be added to and merged with and into the Trust to the same effect as if the property were an asset of the Trust at my death. All property added to the Trust shall be held, administered, allocated, and distributed according to its terms, including any amendments made to the Trust during my lifetime.

Exh. 9 at 1.[2] The "residue" thus included all of the first decedent's assets – whether tangible or intangible – including the decedent's community share of any assets covered by the Marital Property Declaration that happened to be outside the Trust at the time of

---

automobile were held in joint tenancy was incorrect. Schedule A to the Trust Agreement also confirms that the couple's automobile and all bank accounts were in the Trust.

[2] Several pages of Richard's pour over will were missing from Mr. Book's files, although we have the signature page and witness page. Richard's will does not appear to have been filed with Santa Cruz Superior Court after Richard's death, as required by California law (Calif. Probate Code § 8200), which provides that "[a] custodian of a will who fails to comply with the requirements of this section is liable for all damages sustained by any person injured by the failure" (*Id.*, § 8200(b)). Exhibit 9 is Peggy's pour over will, which is presumably identical to Richard's. A copy of Richard's pour over will was included in the "Estate Planning Book" that Mr. Book sent to the Musgraves on April 4, 2002 (Exh. 6). The attached Document Requests include a request for the Estate Planning Book, which should include a copy of Richard's will.

> the first decedent's death. In other words, under the terms of the pour over will, all of
> Richard's interest in any community property transferred immediately to the Trust upon
> Richard's death.

- He recommended that all insurance proceeds be directed to the Trust:

    d.    **Life Insurance.** In order to integrate your present life insurance policies into your
    estate plan, life insurance policies owned by you as your community property should name
    the Trust as beneficiary as follows:

        Trustee(s) as named in the Richard A. Musgrave and Peggy B. Musgrave, Trustees
        of the Richard and Peggy Musgrave Revocable Trust dated April 3, 2002.

        Each of you may be named as secondary beneficiary of life insurance policies on the
        other's life, so that if the Trust is not in existence at the first of your deaths, the proceeds will
        be payable to the survivor of you. The actual ownership of the life insurance policy is not
        changed, just the beneficiary designation.

    Letter from Mr. Book to Richard and Peggy, April 4, 2002 (Exh. 6), at 2.

- He advised that for IRAs, for maximum flexibility, each spouse should name the other as
  beneficiary, and that the Trust be named as secondary beneficiary:

    e.    **Retirement Accounts.** Pension, Profit Sharing, Benefits, IRS and similar types of
    retirement accounts should name each other as primary beneficiary in order to preserve
    maximum tax flexibility. The Trust should be named as the secondary beneficiary as
    follows:

        Trustee(s) as named in the Richard A. Musgrave and Peggy B. Musgrave, Trustees
        of the Richard and Peggy Musgrave Revocable Trust dated April 3, 2002.

    Letter from Mr. Book to Richard and Peggy, April 4, 2002 (Exh. 6) at 3.

    At the time (as shown above), Richard held an IRA worth $45,035, and Peggy held an
    IRA worth $206,626. Based on the documents that have been made available to me, it
    does not appear that the couple owned any annuities, or any other instruments "on which
    recognition of income has been deferred" (Decl. Trust Art. 3.A) at the time of the
    formation of the Trust. The files do not indicate whether Richard and Peggy did as
    advised (to name each other the beneficiary of each such instrument). But as explained
    below, that question is only relevant to Richard's IRA, the value of which was only
    $34,545.94 at the time of Richard's death.[3]

---

[3] From the documents available to me, I cannot tell why Richard's IRA decreased in value
between 2002 and 2008. Perhaps the couple took distributions from this IRA.

- He drafted the Trust document to provide that, upon the death of the first spouse, a Bypass Trust would be created, containing the decedent's share of the assets:

  2.    The surviving trustor's share of the net proceeds of this trust shall remain in the living trust with the surviving trustor as primary trustee and primary beneficiary. Debts of decedent-trustor, debts of this trust, and expenses of the last illness and funeral expenses of the decedent-trustor shall be paid from decedent-trustor's share. After said expenses are paid, our trustee(s) shall divide the decedent-trustor's share of net proceeds of this living trust into separate shares, hereinafter referred to as the Marital Deduction Share and the Non-Marital Share. Our trustee(s) may divide community property in a non pro rata manner and shall take into account any written agreement between the trustor providing for a non pro rata division of their community property and the effect of such agreement on community property passing outside the trust. The trustee(s) shall have the discretion to select the assets to be allocated, but such assets as are selected shall be valued as hereinafter provided.

  Decl. Trust (Exh. 1) at 4 (Art. 2.A.2).

  As indicated, the only deductions from this share were to be "[d]ebts of the decedent-trustor, debts of this trust, and expenses of the last illness and funeral expenses of the decedent trustor." Although this provision as written contemplates the existence of "community property passing outside the Trust," the pour over will ensured that this would not happen – under the pour over will, the first decedent's share of any community property held outside the Trust was to "pour" into the Trust upon the first death.

In other words, Mr. Book set everything up so that the couple's assets would be mutually shared regardless of whether the assets were inside or outside of the Trust, and, at the death of the first spouse, that party's one-half share of any assets held outside the Trust would be "poured" into the Trust. The Bypass Trust would then be created out of the decedent's one-half share of the combined assets, subject only to some relatively minor deductions.

## B.   **What Went Wrong**

At the time of Richard's death, the jointly held assets were about $3.6 million, and, as shown above, the clear intent of the parties as memorialized in all of the relevant documents was that the estate be split 50-50. Nevertheless, the Bypass Trust was funded with only about $1.2 million, essentially a 2-1 split in favor of Peggy and her heirs. To see what went wrong, we need to look at what happened in the property division. As shown below, that division violated the express terms of the Declaration of Trust, the express terms of the Marital Property Declaration, the express terms of Richard's pour over will, and most of all, Richard and Peggy's intent, both expressed and implied. The property division is memorialized in a document titled "Memorandum of Allocation," a five-page memorandum with 4 "Exhibits" as attachments (Exh. 10). The Memorandum of Allocation appears to be the root of the trouble – in critical places, it makes no reference to the language of the Trust, and, in fact departs from that language in obvious ways. It is also inconsistent with some of its own Exhibits. This document is best

ignored in attempting to ascertain the appropriate property division. Accordingly, I first evaluate
the property division based on the legally-relevant documents, and then return, below, to a
specific discussion of the errors in the Memorandum of Allocation.

**1.    Improper Deductions:  Nearly all of the Deductions Itemized in Exhibit D to
       the Memorandum of Allocation Appear To Have Been Improper.**

The only deductions authorized by the Trust document from Richard's share were to be "[d]ebts
of the decedent-trustor, debts of this trust, and expenses of the last illness and funeral expenses of
the decedent trustor."  Nevertheless, Exhibit D of the Memorandum of Allocation itemized five
deductions from Richard's share, only one of which – Funeral Expenses – was a permitted
deduction under the language of the Declaration of Trust:

### Exhibit D

The value of stock porfolio at time of distribution was $2,103,426.00 (see attached).
72% was allocated to ByPass Trust: $2,103,426 x 72% = $1,514,466.00

Out of this share deduct:

| | |
|---|---|
| Specific bequests | $200,000.00 |
| Charity bequests | $20,000.00 |
| Funeral expenses | $10,382.00 |
| Attorney fees | $20,000.00 |
| Appraisal fees | $750.00 |
| | $251,132.00 |

**Total:**                                   **$1,263,334.00**  To be allocated to ByPass Trust

See attached list of stocks
allocated by client and her broker.

I address each line item in Exhibit D in turn.

**a.    The Trust Language Does Not Support Deducting $220,000 for
       "Specific Bequests" and "Charity Bequests" From the Assets
       Allocated to the Bypass Trust.**

The Declaration of Trust provided for $220,000 in "gifts" (not, as suggested in Exhibit D,
"bequests") to be distributed from the Trust upon the death of the first spouse, prior to creation of
the Bypass Trust:

## A.     ALLOCATION OF ASSETS UPON DEATH OF ONE SPOUSE:

1.     Upon the death of the first spouse, the Trustee (s) shall distribute $50,000.00 each to PAMELA CLYNE, ROGER RICHMAN, THOMAS RICHMAN and HARRY CRAUSE. In the event any of the aforementioned do not survive the first spouse to die, their gift shall lapse.

If Peggy is the first to die, the Trustee (s) shall distribute the sum of $20,000.00, in her name, to Newnham College, Cambridge University, England, $20,000 to Derek Brewer if living and $20,000 to Alison Brewer Pizzey, if living. If Richard is the first to die, the Trustee (s) shall distribute the sum of $20,000.00 to Harvard University, to be added to the Holtzer Fellowship Fund, provided however, if this fund is not active, Harvard is directed to use the money to provide a fellowship for a German graduate student in economics.

2.     The surviving trustor's share of the net proceeds of this trust shall remain in the living trust with the surviving trustor as primary trustee and primary beneficiary. Debts of decedent-trustor, debts of this trust, and expenses of the last illness and funeral expenses of the decedent-trustor shall be paid from decedent-trustor's share. After said expenses are paid, our trustee(s) shall divide the decedent-trustor's share of net proceeds of this living trust into separate shares, hereinafter referred to as the Marital Deduction Share and the Non-Marital Share. Our trustee(s) may divide community property in a non pro rata manner and shall take into account any written agreement between the trustor providing for a non pro rata division of their community property and the effect of such agreement on community property passing outside the trust. The trustee(s) shall have the discretion to select the assets to be allocated, but such assets as are selected shall be valued as hereinafter provided.

Decl. Trust (Exh. 1), at 4 (Art. 2.A.1-2) ("Plan of Distribution").

The language of these two paragraphs is clear:  the $220,000 is to be paid out of the Joint Trust – out of the combined assets of the survivor and the decedent – prior to the property division. The "net proceeds" remaining after this distribution are then divided into the Survivor's Share (Peggy's share), the Marital Share (the unfunded QTIP Trust), and the Non-Marital Share (Richard's share – the Bypass Trust). There is nothing in the Trust document that would justify charging the full $220,000 solely to Richard's share of the assets. The Trust Agreement specifies that the money is to be paid out of the Trust, and only after that has been done is the Bypass Trust established. And the Bypass Trust only permits deductions for "[d]ebts of the decedent-trustor, debts of this Trust, and expenses of the last illness and funeral expenses of the decedent-trustor." If this amount were intended to be deducted from Richard's share, it would have been spelled out specifically, like the funeral expenses. And of course, it would torture common sense to label these payments – which were paid out several months before the property division – as "debts" of the Trust.

If this analysis is correct, then the Bypass Trust was underfunded by $110,000.

**b.      The $20,000 in Attorney's Fees and the $750 Appraisal Fees Should Have Been Divided Equally Between Richard and Peggy's Shares.**

Under the Declaration of Trust's "Allocation of Assets" provision as set forth above, there is no indication that the attorney's fees associated with the property division were to be charged solely to Richard's share of the assets. If they were to be so charged, it would have been very easy for Mr. Book to simply say so in the provision stating what expenses would be paid from the first decedent's share. Given that the attorney's fees were incurred for the purpose of dividing the jointly-held assets into Richard and Peggy's separate shares, it seems most appropriate to allocate the attorney's fees equally between the two shares.

Accordingly, at most only $10,000 for attorney's fees should have been deducted from the Bypass Trust.[4]

Although the amount is much smaller, the same principle applies to the $750 "appraisal fees." There is no reason that these should have been charged solely to the Bypass Trust.

**c.      The "Funeral Expenses" Could Be Argued To Be Excessive.**

You mentioned to me once that you had prepaid your own cremation expenses with the Neptune Society, following Richard and Peggy's example. If your information about Richard's prepayment is accurate, then one might question the request for reimbursement for $1300 for "Cremation, etc." (Exh. 11). I do not recommend raising this as an issue, but I feel obligated to set it down here.

**2.      Improper Exclusions: The Property Division Appears To Have Improperly Excluded More than $910,000 From the Trust.**

The property division excluded IRAs, annuities, life insurance, and personalty totaling $950,832.00. It appears that these assets simply became part of Peggy's holdings, and that Richard's share in these excluded assets was not subjected to probate.[5]

---

[4] If my assessment of the property division is correct, then perhaps there is a cause of action against the Book firm for a refund of these fees. At a minimum, I would think they should be responsible for any attorney's fees incurred by Peggy in clearing this matter up.

[5] This assumption should be confirmed with Peggy and/or Ms. Parrish.

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 14 of 36

The Memorandum of Allocation contains the following as Exhibit B:

**Exhibit B**

**Total Estate:**              **$3,629,377.00**

Less Assets Outside of Trust:

| | |
|---|---|
| IRAs | $245,835.00 |
| Annuities | $560,392.00 |
| Life Insurance | $82,105.00 |
| Personalty | $62,500.00 |
| | $950,832.00 |

| | |
|---|---|
| **Trust Estate:** | $2,678,545.00 |
| **Community Shares of Each:** | $1,339,273.00 |

Allocation of community share to ByPass trust is to be made up of the stock assets.
The community share of Decedent represents 72% of the stock portfolio at time of death

Nothing in Mr. Book's files explains why the IRAs, annuities, life insurance, and personalty were excluded from the property division, and why they were not part of the "Community Share of Each." In this regard, the Memorandum of Allocation (Exh. 10) contains no discussion whatsoever of the Marital Property Declaration or of Richard's pour over will. Upon review of each of these exclusions, I believe that the total "assets outside the Trust" should have been at most $34,545.94, representing Richard's IRA, which, assuming he named Peggy as beneficiary,[6] would have passed directly to Peggy upon Richard's death. As shown below, all of the other exclusions appear to have been improper.

### a. Richard's Share of $62,500 in Personalty.

As shown above (Declaration of Trust Art. 3.A; Comprehensive Transfer Agreement), the parties agreed that all of the couple's personalty – including the clothes on their backs, plus anything acquired after the formation of the Trust – was to be both community property and trust property. As such, half of the value of the personalty ($31,250) should have been included in the Bypass Trust. This does not mean that every other piece of furniture or clothing had to be placed in the Trust; instead, it merely means that Richard's share of that personalty (which would, presumably, be retained by Peggy) needed to be accounted for in the property division. This is what the Trust means by giving the Trustee the power to "divide community property in a non-pro rata manner." This could have – and should have – been effectuated by crediting Richard's Bypass Trust with half of the value of the personalty: $31,250.[7] This result is supported by two

---

[6] The question of whether Richard's IRA named Peggy, and not the Trust, as beneficiary should be confirmed with Peggy as well.

[7] To be clear, even though the personalty consisted of physical objects that were in the couple's physical possession, those objects were legally owned by the Joint Trust, and they should have

mutually-reinforcing points: the parties agreed (in the Declaration of Trust and Comprehensive Transfer Agreement) that all of their personalty was to be placed in the Trust, and also agreed (in the Marital Property Declaration) that all of their property was community property.

Even if this personalty was somehow supposed to be "outside" the Trust, it would still have to be accounted for in the property division by operation of the Marital Property Declaration and Richard's pour over will. Richard's share in these assets would have been part of his residual estate, and as such, should have been placed in the Bypass Trust.

### b.    Richard's Share of $82,105 in Life Insurance Proceeds

Richard paid $20,000 for a "single premium" Fireman's Fund insurance policy on August 7, 1984 (Exh. 12):

Richard's application for this insurance makes clear that Richard wanted the proceeds to go to his Trust. This is also the asset that Richard said, in his January 5, 2002 letter (Exh. 2), was payable to "Trust":

2. ✓Life Insurance, payable to "Trust"        $      67,525

been split 50-50 between the survivor's share and the decedent's share at the property division. Since the Bypass Trust was to be funded with stock, an amount of stock equal to half the value of the personalty should have been credited to the Bypass Trust. This would have resulted in the full $62,500 worth of personalty being owned by Peggy's Trust, while Richard's Trust would have received an extra $31,250 to balance the $31,250 in personalty that went to Peggy's side.

That the Trust formed by Mr. Book became the beneficiary appears to be confirmed by Mr.
Book's March 6, 2007 letter to the insurance company (now RiverSource) (Exh. 13):

BOOK & BOOK, LLP
2755 S. BAYSHORE DRIVE
CORAL GABLES

March 6, 2007

RiverSource Life Insurance Company
829 Ameriprise Financial Center
Minneapolis, MN 55474

Re:    Richard A. Musgrave
       # SP- 8017160

Dir Sir/Madam:

Enclosed please find the following documents:

1. A copy of the letter sent to Peggy B. Musgrave on January 18, 2007 from Daniel Eston-
   Jones of RiverSource Life Insurance Company requesting documents listed below as 2-6;
2. Certified Death Certificate of Richard A. Musgrave;
3. Death Claim Statement, notarized;
4. Certified copy of the Richard and Peggy Musgrave Revocable Trust;
5. Original Life Insurance Policy from Fireman's Fund American Life Insurance Company;
6. IRS Form W9 listing the EIN for the Richard and Peggy Musgrave Revocable Trust
   Dated 04-03-02.
7. Certification of Trust signed by Peggy B. Musgrave with Trustee(s)' Powers attached.

If you have any questions, please call the office. Thank you for your attention to this
important matter.

Very truly yours,

BOOK & BOOK, LLP

By: _____
    DENNIS R. BOOK, Partner
    *Certified Specialist in Estate Planning, Trust & Probate.

DRB:jrl alghof

If Richard had named Peggy as beneficiary of the life insurance policy, then she presumably
would have been entitled to the proceeds. But he didn't – consistent with the instructions in Mr.
Book's April 4, 2002, letter (Exh. 6), relevant portion reproduced above), Richard had
designated that the proceeds should go to the "Trust," and Mr. Book and Peggy requested the
insurance proceeds on behalf of the Trust.

Under these circumstances, these proceeds should not have been excluded from the property
division. Accordingly, at least half of the proceeds of this insurance policy – $41,052.50 –
should have gone to the Bypass Trust. Based on the documents available to me, it may be
possible to argue that Richard intended all of the proceeds to go to the Bypass Trust (especially if
Peggy's own insurance policy of comparable worth was to be kept outside the Trust). Because
the treatment of this asset might have implications for the way other assets are treated, I would
not necessarily reject the possibility that all $82,105 should have gone to the Bypass Trust out of
hand. In any event, additional documents might shed more light on the merits of that argument.

### c. Richard's Share of The $560,392 AIG SunAmerica/AllState Annuity

At the time of Richard's death, there was an annuity in Peggy's name with AIG SunAmerica having a contract value of $569,971.37 and a surrender value of $564,748.70:



AIG SunAmerica Account Summary, Jan. 16, 2007 (Exh. 14).

This asset does not appear to have existed at the time of the formation of the Trust. It thus appears to have been created out of assets that were both trust assets and community property. I base this conclusion primarily on the fact that there is no mention of such an annuity in Richard's January 5, 2002 letter to Mr. Book (Exh. 2), or in any of the subsequent correspondence between the Musgraves and Mr. Book. Instead, the assumption underlying that correspondence was that all of the assets listed in Richard's January 5 letter except for the IRAs would go into the Trust. Consistent with these indications that this was a later-acquired asset, it was listed as a Trust

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 18 of 36

Asset in CitiGroup Smith Barney's listing of Holdings (56D-00934-14) as of January 17, 2007,
(Exh. 15):


SMITHBARNEY

Peggy B. Musgrave .Richard A.
Musgrave, Trtee's Of The
Richard .Peggy Musgrave Rev.
Trust Dtd 04/01/2002
2385 Delaware Ave, De Anza 163
Santa Cruz CA 95060-5718

Prepared by: KEVIN L. MIZE
831-440-9030

**Holdings**
01/17/2007

56D-00934-14

| Symbol\CUSIP | Description | Quantity | Price | Market Value | Unit Cost | Cost Basis | Gain/Loss | G/L % | Purchase | Term | Cla | Mrkt | Div | T-C | %12MV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| #BDP | BANK DEPOSIT PROGRAM | 14,518.71 | 1.000 | 14,546.93 | 1.000 | 14,518.93 | 0.00 | 0.00 | | | | | | | 1.40 |
| 033990144000 | AIG SUNAMERICA LIFE ASSURANCE AS OF 01/11/2007 | 522,267.00 | 1.077 | 562,956.82 | | | | | | | | | | | 54.00 |
| IGNCX | IVY GLOBAL NATURAL RESOURCES | 3,768.93 | 26.410 | 99,537.49 | 23.220 | 87,515.74 | 12,021.75 | 12.74 | * | LI-ST | | | k | 23 | 9.55 |

With relevant part magnified:

Prepared by: KEVIN L. MIZE
831-440-9030

**Holdings**

01/17/2007

| Symbol\CUSIP | Description | Quantity | Price | Market Value | Unit Cost |
|---|---|---|---|---|---|
| #BDP | BANK DEPOSIT PROGRAM | 14,518.71 | 1.000 | 14,546.93 | 1.000 |
| 033990144000 | AIG SUNAMERICA LIFE ASSURANCE AS OF 01/11/2007 | 522,267.00 | 1.077 | 562,956.82 | |
| IGNCX | IVY GLOBAL NATURAL RESOURCES | 3,768.93 | 26.410 | 99,537.49 | 23.220 |

Exhibit A to the Memorandum of Allocation indicated that Richard had a half-share of this asset
at the time of his death, or \$280,196.25 (as indicated in "Decedent's 50%" column):

| ASSET DESCRIPTION | ADDITIONAL INFO | QTY | Price AVG | VALUE 100% | Survivors 50% | Decedents 50% |
|---|---|---|---|---|---|---|
| GNMA PL#015872X DTD 08/01/2003 (962905FM80R0) | Coupon 4.5% Mature 08/15/33 | | 19,057.540 | \$19,057.54 | \$9,528.77 | \$9,528.77 |
| | | TOTAL - Peggy IRA's | | \$211,286.00 | \$105,693.00 | \$105,693.00 |
| | | TOTAL | | \$245,833.34 | \$122,917.67 | \$122,917.67 |
| **Annuities** | | | | | | |
| AIG SUNAMERICA LIFE ASSURANCE AS OF 01/10/2007 (033990144000) | | 522,267.00 | 1.073 | \$560,362.49 | \$280,198.25 | \$280,196.25 |
| METLIFE LIFE & ANN CO OF CONN AS OF 01/10/2007 | | 81,633.000 | 1.301 | \$80,444.73 | \$40,222.37 | \$40,222.37 |
| | | TOTAL | | \$640,837.22 | \$320,418.61 | \$320,418.61 |
| **Life Insurance** | | | | | | |
| RiverSource Life Insurance Co #SP-6017180 | | | | \$82,105.00 | \$41,052.50 | \$41,052.50 |
| | | TOTAL | | \$82,105.00 | \$41,052.50 | \$41,052.50 |
| **Furniture and Fixtures** | | | | | | |
| Furniture and Fixtures | | | | \$60,000.00 | \$30,000.00 | \$30,000.00 |
| | | TOTAL | | \$60,000.00 | \$30,000.00 | \$30,000.00 |
| **Automobiles** | | | | | | |
| 1989 Acura Legend | | | | \$2,500.00 | \$1,250.00 | \$625.00 |
| | | TOTAL | | \$2,500.00 | \$1,250.00 | \$1,250.00 |

Memorandum of Allocation (Exh. 10), Exhibit A.

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 19 of 36

A page appearing after Exhibit D to the Memorandum of Allocation listed an asset of similar magnitude (market value: $536,080), now denominated "AllState Life," as being held for Peggy Musgrave as Trustee.

## Holdings      03/04/2008
### For - Peggy B. Musgrave Ttee

| Symbol\CUSIP | Description | Quantity | Price | Market Value |
|---|---|---|---|---|
| #BDP | BANK DEPOSIT PROGRAM | 28,407.48 | 1.000 | 28,407.48 |
| #BDP | BANK DEPOSIT PROGRAM | 247,808.04 | 1.000 | 247,808.04 |
| 299994061000 | ALLSTATE LIFE AS OF 02/27/2008 | 562,212.00 | 0.953 | 536,080.38 |
| IGNCX | IVY GLOBAL NATURAL RESOURCES | 4,133.65 | 34.250 | 141,577.78 |
| WASCX | IVY ASSET STRATEGY FUND | 915.75 | 27.530 | 25,210.62 |
| LMCCX | LORD ABBETT MID-CAP VALUE FUND | 324.00 | 14.830 | 4,804.92 |
| OIBCX | OPPENHEIMER INTL BOND FUND | 81,068.18 | 5.690 | 408,846.16 |

Memorandum of Allocation (Exh. 10), Exhibit D.

There is a similar asset listed in a Citigroup Smith Barney Statement (56D-00934-14), dated 11/06/2007:

| | | | | | Holdings | | | $\iota\iota\iota\iota\cdots$ | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prepared by: THE MECK GROUP | | | | | 11/06/2007 | | | | | | | | | | | 56D-00934-14 |

| Symbol\CUSIP | Description | Quantity | Price | Market Value | Unit Cost | Cost Basis | Gain Loss | Est % | Purchase | Term | Sta | Mtus | Unc | E-C | % LMV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| #BDP | BANK DEPOSIT PROGRAM | 33,905.20 | 1.000 | 33,935.20 | 1.000 | 33,805.77 | 0.00 | 0.00 | | | | | | 1-4 | 1.39 |
| BP | *** BP PLC SPONS ADR | 328.04 | 70.760 | 23,413.12 | 63.623 | 20,871.68 | 2,971.04 | 3132 | 49/15/2007 | LT | | LT | C | 2.2 | 1.00 |
| 299NC | LTD INT STRATEGIC S&P IND Ins-C | 47,845.00 | 1.000 | 53,944.68 | 1.118 | 53,168.63 | 1,027.00 | 4.99 | 49/46/2007 | ST | | | | 2.3 | 3.06 |
| 299994061000 | ALLSTATE Life AS OF 11/01/2007 | 543,373.00 | 1.000 | 543,373.00 | | | | | | | | | | 1.4 | 33.42 |

Exh. 16.

Assuming the AIG asset and the AllState annuity are one and the same, there are at least five compelling reasons why this annuity should not have been excluded from the property division:

- First, it was actually in the Trust at the time of Richard's death, and as late as March 2008 (by which time it was in the form of an asset with AllState Life), as indicated in the portion of Exhibit D to the Memorandum of Allocation, reproduced above.

  Because the AllState annuity was in the Trust at the time of property division, it should not have been removed, and should have been accounted for in the property division.

- Second, the annuity did not fall into the category of assets excluded from the Trust. The exclusions appear at the end of the following paragraph (which has also been quoted above):

## *** ARTICLE THREE ***
### TRUSTOR POWERS

### A.   POWER TO FUND THE TRUST:

After this trust is duly executed, we will execute and deliver all deeds, assignments, bills of sale, written instructions and other legal documents necessary to convey and register all of our assets that we choose to place in trust under this trust to be owned by the trustee(s) of this trust and hold and administered under the terms and conditions of this trust. Assets which are evidenced by titles or deeds currently being transferred to the trustee(s) of this trust are listed on Schedule A, which is attached to this trust and made a part of this trust. We hereby transfer to this trust all assets not requiring titles or deeds, including but not limited to our furniture, wearing apparel, and personal possessions. Additionally, the trustor(s) are now holding and will hold, solely and exclusively for and on behalf of such trust, any and all properties of all kinds, whether presently owned or hereafter acquired including, bank accounts, certificates of deposit, mutual and money market funds of all kinds, securities, agency and custody accounts, notes, and real estate wherever located, but not including tax-favored assets on which recognition of income has been deferred including but not limited to IRAs, Roth IRAs, qualified plans under IRC §401(a), tax sheltered annuities, and non-qualified deferred compensation.

Decl. Trust (Exh. 1), Art. 3.A.

Assuming this asset was created after formation of the Trust, it does not meet the exclusion for "tax-favored assets on which recognition of income has been deferred" at the time referred to in the paragraph – at the time of execution of the Trust. There is clearly no prohibition on the Trust's holding an annuity as an asset; such a possibility is contemplated in the Declaration of Trust itself (Art. 2.D (noting that upon closing out the trust upon the death of the surviving spouse, the trustee is prohibited from paying expenses with money from "qualified plans, individual retirement plans, deferred compensation plans under §457 and §403(b) annuity contracts, custodial accounts and/or retirement income accounts.")), and, in fact, the Bypass Trust currently holds an annuity purchased by Kevin Mize. But any such later-acquired annuity must remain in the Trust.

- Third (assuming this asset was created after formation of the Trust), the pre-existing assets from which this annuity was apparently created were both assets of the Trust and community property. Under those circumstances, the annuity should have remained in the Trust, and been accounted for in the couple's community shares. Exhibit A to the Memorandum of Allocation reflects that Richard had a community share in this asset, and yet that share was inexplicably not allocated to the Trust.

- Fourth, even if it were appropriate to consider this asset as being "outside the Trust," it still should have been accounted for in the funding of the Bypass trust. Even outside the Trust, Richard had a half-share community property interest in this annuity, despite the fact that it was in Peggy's name. This would be the case even if – contrary to all appearances – this asset existed in the form of an annuity at the time of formation of the

Trust. At the time of his death, Richard's half-share of this annuity (the $260,196.25 "Decedent's share" from Exhibit A) was part of the "residue" of his estate, and thus should have been "poured" into the Trust pursuant to Richard's pour over will. As with personalty, this does not mean that the annuity had to be broken in half with half of the annuity put into the Trust; it merely means that the amount of Richard's community property share that Peggy wished to retain in the annuity – i.e. half of its value – should have gone to Richard's side of the ledger in the property division. Again, that is the point of the non-pro-rata provision. And again, since the asset appears to have been in the Trust at the time of Richard's death, we need not even reach this community property question.

- Finally, as a matter of fairness and equity, and to give effect to the intent of the parties, it makes no sense for such a large asset to pass in its entirety outside the Trust, to Peggy alone. As shown above, all of Mr. Book's work in 2002 on behalf of the couple was with the object of giving each spouse the confidence that their one-half share of the couple's joint assets would be distributed as desired. The couples pooled their assets accordingly, pursuant to the Marital Property Declaration. By deeming this asset outside the Trust – without explanation or justification – the property division essentially nullified everything that Mr. Book had worked so hard to accomplish on behalf of Richard and Peggy in drafting the underlying documents.

Obviously, if this annuity were created solely for the purpose of keeping this amount of money outside the Trust, at the expense of the Bypass Trust, that would raise additional questions. I recommend that you request an explanation of when and why this annuity was created (in both its AIG and AllState incarnations), and on whose advice that was done, as well as documents relating to its creation as an AIG asset and then as an AllState asset.

### d. Richard's Share of Peggy's $211,386 IRAs

As explained above, Richard had a community property interest amounting to half the value in the annuity held in Peggy's name, even if that asset existed at the inception of the Trust. For exactly the same reason, he had a community property interest in Peggy's IRAs. The Book firm was fully aware of and understood this interest, as it is reflected in the "Decedent's 50%" column in Exhibit A to the Memorandum of Allocation:

| ASSET DESCRIPTION | ADDITIONAL INFO | QTY | Price AVG | VALUE 100% | Survivors 50% | Decedents 50% |
|---|---|---|---|---|---|---|
| . . . . | | | | | | |
| | | | TOTAL - Peggy IRA's | $211,386.00 | $105,693.00 | $105,693.00 |

Memorandum of Allocation (Exh. 10), Exhibit A, at 4.

As with the annuity (fourth bullet point), even if these IRAs were "outside the Trust," Richard still had a community property interest in them at the time of his death, and after his death, this interest was in his residual estate. Pursuant to the pour over will, this interest should have gone into the Trust. Again, this was a simple accounting matter – if Peggy wished to retain the asset

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 22 of 36

intact and outside the Trust, Richard's share of it could have simply been accounted for in the
property division. Richard's share could not simply vanish, as it appears to have done.[8]

Although I believe a full half of Peggy's IRA should have gone to Richard's share under the
terms of the community property agreement and the Trust (and as reflected in Exhibit A), I note
that there were approximately $41,600 in purchases made for this IRA _after_ the formation of the
Trust in 2002, as shown in the "Purchase" column of the Citigroup Smith Barney statement
reproduced below:



*** Peggy D. Musgrave
CGM IRA Rollover Custodian
2395 Delaware Avenue
De Anza 163
Santa Cruz CA 95060-5719

**Holdings**

Prepared by: KEVIN L. MIZE
331-440-9030

01/17/2007                                                                                                  56D-60935-17

| Symbol/CUSIP | Description | Quantity | Price | Market Value | Unit Cost | Cost Basis | Gain Loss | Gn. % | Purchase | Term | Cd. | Mcm | Div. | T-C | % LMV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WBIF | BANK DEPOSIT PROGRAM | 2,906.15 | 1.000 | 2,906.42 | 1.000 | 2,930.40 | 0.00 | 0.00 | | | | | | L-7 | 1.35 |
| FADCX | FIDELITY ADVISOR DIVERSIFIED | 693.14 | 21.930 | 10,697.38 | 15.847 | 8,216.15 | 2,477.03 | 30.13 | * | LTST | | | R | L-7 | 5.03 |
| FNICX | FIDELITY ADVISOR NEW INSIGHTS | 1,112.22 | 18.310 | 21,003.29 | 16.041 | 19,520.10 | 2,034.19 | 10.69 | * | LTST | | | B | L-7 | 10.01 |
| GSBCX | GOLDMAN SACHS SMALL CAP VALUE | 182.63 | 39.650 | 7,220.41 | 36.132 | 6,577.31 | 693.66 | 10.57 | * | LTST | | | R | L-2 | 1.45 |
| IRVEX | ING INTERNATIONAL VALUE FUND | 886.85 | 20.500 | 17,562.93 | 13.284 | 11,767.84 | 6,735.08 | 57.85 | * | LTST | | | B | L-7 | 8.54 |
| IGNCX | IVY GLOBAL NATURAL RESOURCES | 377.39 | 26.410 | 9,915.96 | 22.256 | 7,680.34 | 2,235.62 | 10.69 | * | LTST | | | R | L-7 | 4.23 |
| ICDCX | IVY CUNDILL GLOBAL VALUE | 214.40 | 15.330 | 3,286.76 | 13.832 | 2,961.97 | 324.79 | 19.00 | * | LTST | | | R | L-7 | 1.56 |
| FEOCX | STANDISH VALUE FD CL C | 1,374.33 | 19.990 | 26,108.96 | 21.702 | 29,831.43 | -3,062.50 | -3.55 | * | ST | | | R | L-7 | 13.66 |
| IGRGWC | IMP AGG GRWTH C | 81.69 | 105.236 | 8,672.09 | 85.700 | 6,999.99 | 7,652.00 | 23.59 | 03/24/2004 | LT | | | R | L-7 | 4.15 |
| ACPTBC | IMP CAP ANRL INC C | 464.14 | 17.030 | 7,904.42 | 16.900 | 7,580.50 | 16.10 | 0.20 | * | LTST | | | R | L-7 | 3.75 |
| LMCCX | LORD ABBETT MID-CAP VALUE FUND | 198.99 | 21.670 | 4,426.42 | 17.732 | 6,499.64 | 3,531.83 | 22.31 | * | LTST | | | R | L-7 | 4.00 |
| TGBCX | OPPENHEIMER INTL BOND FUND | 4,888.05 | 5.100 | 27,612.55 | 5.000 | 27,688.08 | -5.86 | -0.17 | * | LTST | | | R | L-7 | 13.11 |
| OIBACX | OPPENHEIMER INTERNATIONAL | 181.55 | 25.494 | 4,631.08 | 16.434 | 2,983.93 | 1,647.02 | 54.84 | * | LTST | | | R | L-7 | 2.19 |
| ODVCX | OPPENHEIMER DEVELOPING MARKETS | 183.06 | 39.510 | 3,232.77 | 24.174 | 4,425.42 | 2,807.35 | 68.48 | * | LTST | | | R | L-7 | 3.43 |
| 36209Y501RB5 | GNMA PL#383541X DTD 05/01/1996 Coupon 7.5% Matures 05/15/26 | 43,000.00 | 103.000 | 6,429.32 | ****** | ***** | ***** | | | | | | | L-7 | 3.06 |
| 36202T0W8400 | GNMA PL#6250178 DTD 11/01/1978 Coupon 9% Matures 11/15/01 | 100,000.00 | 105.544 | 635.42 | ****** | ***** | ***** | | | | | | | L-7 | 0.40 |
| 36208GAG6009 | GNMA PL#430007X DTD 05/01/1995 Coupon 7.5% Matures 05/15/17 | 45,000.00 | 103.125 | 4,367.89 | ****** | ***** | ***** | | | | | | | L-7 | 2.03 |
| 36228O0TZ0RG | GNMA PL#7810747 DTD 01/01/1993 Coupon 6% Matures 01/15/28 | 310,000.00 | 101.275 | 15,312.93 | 102.675 | 15,660.90 | -347.08 | -2.22 | 12/08/2005 | LT | | | | L-7 | 7.27 |
| 36296EFME860 | GNMA PL#815572X DTD 08/01/2001 Coupon 6.5% Matures 08/15/31 | 20,134.00 | 94.593 | 18,553.23 | 99.945 | 19,033.19 | -479.96 | -2.52 | 10/28/2005 | LT | | | | L-7 | 8.81 |
| **TOTALS** | | | | 210,686.71 | | **180,338.63** | **18,914.62** | | | | | | | | |

Statement from Citigroup Smith Barney (56D-60935-17), indicating Holdings as of January 17,
2007 (Exh. 17). To the extent these purchases were made from preexisting Trust assets or
community property (and they must have been, since all the assets of the couple were either in
the Trust and community property (or both)), the arguments in favor of passing half of this asset
to Richard's Trust are all the stronger.

---

[8] If these were ERISA-qualified IRAs, then Richard might not have had a share in them after all.
_See Boggs v. Boggs_, 520 U.S. 833 (1997). There is no indication that any of these IRAs were
ERISA-qualified, however, and every indication that they were simply IRAs initiated and run by
Peggy (or Richard and Peggy), not Peggy's employer. Again, the listing of a "Decedent's Share"
in Exhibit A for these IRAs seems to indicate that the couple and their attorney considered these
IRAs to be community property.

### 3.     Specific Errors in the Memorandum of Allocation

The Memorandum of Allocation is so riddled with errors that it might well have been drafted with a different Trust agreement in mind.  The Memorandum has no separate legal force and effect, so attempting to construe it, in the end, is a legally meaningless exercise.  Nevertheless, since the problems and misunderstandings concerning the Trust seem to stem from it, I'll analyze the relevant provisions briefly here.  Significantly, the Memorandum of Allocation makes no reference whatsoever to the actual language of the governing Trust Agreement; to the extent that it purports to be following specific provisions of the Trust, it simply mischaracterizes those provisions.  At other points the Memorandum itself is ambiguous and/or incomprehensible.

- Section 4 of the Memorandum of Allocation erroneously allocates all expenses of administration to the Bypass Trust:

> 4.     **Allocation of Expenses to Bypass Trust.**     All expenses of administration shall be allocated to the Bypass Trust.

As discussed above, the Declaration of Trust makes no provision for allocating the "expenses of administration" to the Bypass Trust.  Accordingly, these expenses should have been divided 50-50.  Given that these "expenses" were deemed to include $20,000 in attorney's fees, the misallocation of these expenses was not an insignificant error.[9]

- Section 5 of the Memorandum of Allocation Erroneously and Without Explanation Excludes Nearly $1 Million From the Trust:

> 5.     **Calculation of Trust Estate Available for Distribution.**  The value of the community share of the total estate at the time Richard A. Musgrave's death was $1,814,688.00.  The Survivor's community interest in the total estate as of said date was likewise $1,814,688.00.  See Exhibit A attached hereto and incorporated herein by this reference.  Certain assets of the total estate were not, however, part of the Trust Estate.  Several assets were held outside of the trust, with each of Richard and Peggy naming the other the designated beneficiary of said assets.  The total Trust Estate accounted for herein is $2,678,543.00.  The Decedent's (Richard A. Musgrave) community share of the Trust Estate is $1,339,273.00.  The community share of the Survivor (Peggy Musgrave) is likewise $1,339,273.00.  See Exhibit B attached hereto and incorporated herein by this reference.

---

[9]  In litigation against the Book firm, we could make atmospheric use of the fact that this rather stiff fee added $20,000 of insult to the hundreds of thousands of dollars of injury caused to the Bypass Trust by the Book firm's sloppy work.  I am not, however, recommending bringing an action against the Book firm at this time.

This starts by acknowledging, correctly, that Richard had a "community share" of just over $1.8 million, and that Peggy had the same. It then goes badly wrong by stating that "certain assets were not . . . part of the Trust Estate," and that "several assets were held outside the Trust." Those vaguely-described assets are presumably the assets listed in Exhibit B, but, as shown above, each of those assets was either (1) in the Trust all along, or, if not, then (2) Richard's community share in them went into the Trust by operation of his pour over will. It simply makes no sense for this Memorandum to acknowledge Richard's $1.8 million community share, without analyzing how the pour over will operated as to these assets. The drafter of the Memorandum knew that Richard had a will, because the Memorandum starts by saying that Richard died "testate." After that fleeting acknowledgement, however, there is no attempt to relate the provisions of the will to the property allocation. As shown above (section A), the pour over will and the allocation should have been inextricably linked, at least as to any assets believed to be "held outside the trust."

- Section 6 of the Memorandum of Allocation Erroneously Deducts $220,000 From the Bypass Trust:

  6.  **Specific Distribution of Decedent's Share.** The Trustee, pursuant to

  the terms of the Trust, made the following specific distributions out of Richard A.

  Musgrave's share of the Trust assets:

  - (i)    $50,000 to Pamela J. Clyne
  - (ii)   $50,000 to Harry Krause
  - (iii)  $50,000 to Roger M. Richman
  - (iv)   $50,000 to Thomas R. Richman
  - (v)    $20,000 to Harvard University

  Distributing these funds out of Richard's share of the Trust was emphatically not pursuant to the terms of the Trust. The Declaration of Trust is clear that these distributions were to be made out of the Joint Trust, prior to formation of the Bypass Trust. There was no reason to charge these solely to Richard's side. See section B.1.a, above.

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 25 of 36

- Section 7.c. of the Memorandum of Allocation Misstates Peggy's Entitlement to Income and Principal of the Trust:

    (c) To Peggy Musgrave, as Trustee of the Richard A. Musgrave Bypass Trust, the property described in Exhibit D attached hereto and incorporated herein by reference, having a total value of $1,263,334.00.

        i.   Such amount of net income from the Bypass Trust, as needed for the health, maintenance and support in accordance with his or her accustomed standard of living shall be distributed currently to the Surviving Spouse in quarter-annual or more frequent installments.

        ii.  The Trustee shall also pay to or apply for the benefit of the Surviving Spouse such sums out of the principal of the Bypass Trust as the Trustee in the Trustee's discretion considers necessary for his or her health, maintenance, and support in accordance with his or her accustomed standard of living.

This paragraph is flatly inconsistent with the terms of the Declaration of Trust. The actual language regarding distributions to Peggy is as follows:

    a.   The survivor of us shall be the trustee of the Bypass Trust and, during the surviving trustor's lifetime, this trust shall be administered for the benefit of the surviving spouse as hereinafter provided. Upon the death of either of us, the plan of distribution and all terms of this Bypass Trust shall become unamendable and irrevocable. The trustee shall pay to or use for the benefit of the surviving trustor so much of the net income and principal of the Bypass Trust as the trustee shall deem necessary for the health, education, maintenance, or support of the surviving trustor, taking into consideration all other means available to the surviving trustor for such purposes from all sources known to our trustee.

In particular, subparagraph (i) differs substantially from the Declaration of Trust in at least the following ways:

- o  its references to "quarter-annual or more frequent installments" and "accustomed standard of living"

- o  its failure to mention the trustee's role in determining the need for payments; and

       o   its failure to mention the requirement of "taking into consideration all other means available to the surviving trustor."

The demonstrably incorrect subparagraph (i) might have been what Peggy relied on for her belief that she was entitled to all the income from the Bypass Trust. As Mr. Book subsequently acknowledged (Exh. 18) (April 3, 2009 letter from Dennis Book to Harry Krause),[10] Peggy was not entitled to that income, except in case of "need," with other assets being taken into account.

## 4.    Assets Not Accounted for In Property Division

The property division counted a total of just over $3.6 million for the joint estate. See Exhibit A to Property Allocation. I do not have any way to determine whether there might have been additional assets that somehow escaped the notice of the drafter of Exhibit A. Given the sloppiness with which the property division was handled, it would not surprise me if other such assets existed. My review of the files raises a question with respect to "Scholar's Choice" accounts that appear to have been held by Peggy on behalf of Cooper Richman ($61,569.81), Paris Richman ($62,517.12), and Ana Jones ($61,856.83). According to statements from Smith

---

[10]  Mr. Book wrote:

      You are correct in your reading of the Trust. Peggy's share of the property remains in trust and she is entitled to all of the income out of this portion. The Martial Share (QTIP) ended up not being used as there were not sufficient assets so as to require funding. Had it been funded, Peggy would have been entitled to all of the income as that is a requirement of the IRS marital trust provisions.

      The non-marital share (Bypass Trust) was, of course, funded with Richard's share of the Trust property. The Bypass Trust does not require distribution of income. It provides that the Trustee shall pay to or use for the benefit of the surviving trustor so much of the net income and principal of the Bypass Trust as the trustee shall deem necessary for the health, education, maintenance, or support of the surviving trustor, taking into consideration all other means available to the surviving trustor for such purposes from all sources known to our trustee. The real purpose of this provision is to make income and principal available to the surviving spouse if needed for their health, maintenance and support without having to get into the age-old question of investing primarily for income or primarily for growth. This should allow for a more balanced investment plan.

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 27 of 36

Barney, these assets (a total of $185,943.76) were purchased in 2005 and 2006, which means that
they likely were purchased with assets of the Trust and/or community property:



*** Peggy D Musgrave
Scholars Choice
Fbo Cooper D Richman
2395 Delaware Ave.
De Anza 163
Santa Cruz CA 95060-5718

**Holdings**

Prepared by: KEVIN L MIZE
831-440-9030

01/16/2007

S8D-01078-18

| Symbol/CUSIP | Description | Quantity | Price | Market Value | Unit Cost | Cost Basis | Gain Loss | G/L % | Purchase | Term | Cid | Mean | Div | T-C | % LMV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSCFIC | SCH CHC AGE-BASED 5-6 C | 4,379.80 | 14.230 | 61,569.81 | 13.060 | 56,547.23 | 5,002.58 | 8.86 | 01/03/2006 | LT | | | R | 5-6 | 100.00 |
| TOTALS | | | | 61,569.81 | | 56,547.23 | 5,002.58 | | | | | | | | |

Citigroup Smith Barney "Holdings" Statement for Scholar's Choice Account Fbo Cooper D.
Richman (Exh. 19).



*** Peggy D Musgrave
Scholars Choice
Fbo Paris N Richman
2395 Delaware Ave.
De Anza 163
Santa Cruz CA 95060-5718

**Holdings**

Prepared by: KEVIN L MIZE
831-440-9030

01/16/2007

S6D-01079-17

| Symbol/CUSIP | Description | Quantity | Price | Market Value | Unit Cost | Cost Basis | Gain Loss | G/L % | Purchase | Term | Cid | Mean | Div | T-C | % LMV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSCFIC | SCH CHC AGE-BASED 4-6 C | 4,273.23 | 14.630 | 62,517.13 | 12.930 | 55,252.63 | 7,264.47 | 13.15 | 03/04/2005 | LT | | | R | 1-2 | 100.00 |
| TOTALS | | | | 62,517.13 | | 55,252.63 | 7,264.47 | | | | | | | | |

Citigroup Smith Barney "Holdings" Statement for Scholar's Choice Account Fbo Paris N.
Richman (Exh. 20).



*** Peggy D Musgrave
Scholars Choice
Fbo Ana M Jones
2395 Delaware Ave.
De Anza 163
Santa Cruz CA 95060-5718

**Holdings**

Prepared by: KEVIN L MIZE
831-440-9030

01/16/2007

S6D-01080-14

| Symbol/CUSIP | Description | Quantity | Price | Market Value | Unit Cost | Cost Basis | Gain Loss | G/L % | Purchase | Term | Cid | Mean | Div | T-C | % LMV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSCFIC | SCH CHC AGE-BASED 4-6 C | 4,228.08 | 14.630 | 61,856.83 | 12.000 | 50,948.38 | 10,908.45 | 31.41 | 05/02/2005 | LT | | | R | 1-4 | 100.00 |
| TOTALS | | | | 61,856.83 | | 50,948.38 | 10,908.45 | | | | | | | | |

Citigroup Smith Barney "Holdings" Statement for Scholar's Choice Account Fbo Ana M. Jones
(Exh. 21).

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 28 of 36

Assuming that these were qualified 529 plans, I believe that Peggy, and not the named beneficiary, was the "owner" or "custodian" of these assets (subject, as below, to Richard's community share), and that she retained the ability to change the beneficiary or even withdrawn the money for herself (albeit subject to tax penalties). Thus, unless these assets were subject to a "Separate Property" agreement, Richard presumably still had a community property interest in them at his death. If that's the case, then it would seem that his share of these assets should have poured into the Bypass Trust pursuant to his pour over will.

I would not be surprised to learn that these plans were set up with Richard's approval, given his generous nature. Nevertheless, I feel you are obligated to ask for additional documentation relating to these assets; unless it can be shown that they were the sort of "separate property" contemplated in the governing agreements, Richard might well have retained a community share in these assets that should have been accounted for in the property division. Either way, more information regarding these assets is important – if it can be established that Richard voluntarily and effectively relinquished any share of them, we would not pursue any claim as to these assets, but our claims to other assets for which he did not similarly relinquish his share would be all the stronger.

Likewise, you should also be sure to ask for additional documentation relating to any other assets or accounts that might have been missed in the property division.

## C.    Trustee Compensation and Trustee Fiduciary Obligations

Peggy was placed into an awkward position by being made trustee of the Bypass Trust. This situation created an inherent conflict of interest – she had a fiduciary duty to the irrevocable beneficiaries of Richard's Trust, but any money or asset that was left out of that Trust would remain in her own revocable trust or possession, and thus would stay with her and her children and grandchildren.

As outlined above, many of the decisions that Peggy made as trustee (doubtless on the advice of others) appear to have been improper, and they benefited herself and her heirs at the expense of Richard's designated beneficiaries.

Recently, on the advice of Ms. Parrish, Peggy took an additional $44,371.52 from the Bypass Trust as "trustee compensation." You have already written to Ms. Parrish about this issue (Exh. 22), but she has responded with the assertion that Peggy's compensation was within "the letter of the law" (Exh. 23). I believe you have the stronger position. As an initial matter, the sudden and retroactive nature of the withdrawal – where no compensation had previously been taken – was highly irregular, and appears to violate the spirit, and perhaps even the letter, of Calif. Probate Code 15686, which provides that "(b) A trustee may not charge an increased trustee's fee for administration of a particular trust unless the trustee first gives at least 60 days' written notice of that increased fee" to certain beneficiaries. It has also placed you, as successor trustee, in an awkward position with respect to future tax filings, and raises the possibility that previously-filed returns may have to be amended. But beyond this, the bare amount was clearly excessive under applicable law.

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 29 of 36

There is no question that even a family member trustee is entitled to some "reasonable"
compensation. Applicable case law requires that trustee compensation be based on a
consideration of the totality of circumstances, and has specifically identified the following non-
exclusive factors:

- The income of the trust

- "the success or failure of the administration of the trustee"

- "any unusual skill or experience which the trustee in question may have brought to his
  work"

- "the fidelity or disloyalty displayed by the trustee"

- "the amount of risk and responsibility assumed"

- "the time consumed in carrying out the trust"

- "the custom in the community as to allowances to trustees by settlors or courts and as to
  charges exacted by trust companies and banks"

- "the character of the work done in the course of administration, whether routine or
  involving skill and judgment; any estimate which the trustee has given of the value of his
  own services."

*Estate of McLaughlin*, 43 Cal.2d 462, 467-68 (1954).

A cursory consideration of these factors raises real questions about Ms. Parrish's advice
regarding Peggy's asserted entitlement to a $44,000-plus fee. For one thing, basing the
compensation on the total assets of the trust seems inappropriate, given that Peggy simply

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 30 of 36

delegated the investment decisions to Smith Barney/Morgan Stanley, who collected 1.86%
annually for managing the Trust assets:

**From:** Mize, Kevin L [Kevin.L.Mize@morganstanley.com]
**Sent:** Wednesday, September 03, 2014 1:01 PM
**To:** Krause, Harry D
**Cc:** tkrause@cox.net; Ingesson, Christine E; Darrah, Nayana T
**Subject:** RE: Richard Musgrave Bypass Trust

Dear Harry,

Regarding the fee structure of the mutual funds in Richard's trust, you have a misunderstanding as to how they work. Morgan Stanley does offer "wrap-fee" structured billing on investment accounts in which, if you owned mutual funds, they would not be subject to 12(b)2 fees and you would pay a separate fee to Morgan Stanley for advice and/or management. Alternatively, if your own Class C shares, as you do, there is no separate "wrap-fee" from Morgan Stanley, as the firm is compensated out of the 1% 12(b)1 fee that the funds include in its expenses as a marketing cost. When Morningstar or the fund's prospectus shows the you the funds expense ratio, that is including the 12(b)1 fees. Morgan Stanley is NOT charging a fee on top of that, other than a $6.50 transaction fee in certain circumstances. Because the trust has assets with us in excess of $1,000,000, the annual account fees, which are normally $150 are waived. The Morningstar report we sent you dated 8/13/2014 shows the funds in the portfolio average net expense ratio was 1.86% as of 7/31/2014. So, I am correcting you, because 4% is wrong, as is 2% or 3%. Also, please note that the performance data on the Portfolio Minder report that was also included in our mailing to you shows the actual returns of the trust, NET of all fees.

email from Kevin Mize to Harry Krause, Sept. 3, 2014 (Exh. 24).

More importantly, although ultimately the blame for the botched property division should
probably rest with the Book firm,[11] Peggy had a fiduciary obligation to ensure that it was carried
out fairly vis-à-vis the beneficiaries of the Bypass Trust. If she felt herself unequal to this task,
she could have brought in you or Jim Clyne to help. Indeed, given that both of you were
successor trustees as to both Trusts at the time, perhaps she had an obligation to do so. But
instead, she presided over the property division and never provided any information about it to

---

[11] I note that the advisers themselves could be held liable for much of the bad advice. *See City of
Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445, 80 Cal.Rptr.2d
329, 340-341(Ct. App. 1st Dist. Div. 4 1998) ("[U]nder long-established trust law, trust
beneficiaries retain the right to bring claims directly against third parties who have induced the
trustee to commit a breach of trust, aided or abetted such a breach by the trustee, or received and
retained trust property from the trustee in knowing breach of trust." (citing *Saks v. Damon Raike
& Co.* (1992) 7 Cal.App.4th 419, 428, 8 Cal.Rptr.2d 869; *Pierce v. Lyman* (1991) 1 Cal.App.4th
1093, 1101–1110, 3 Cal.Rptr.2d 236; Rest.2d Trusts, §§ 291–295, 326, pp. 57–73, 124–125; 4
Scott on Trusts (4th ed. 1989) §§ 282, 291, 294.1, pp. 27–28, 77–87, 98–101; Bogert on Trusts
(2d ed. rev.1992) §§ 868–869, 901, pp. 103–123, 304–320; 11 Witkin, Summary of Cal. Law
(9th ed. 1990) Trusts § 164, p. 1017.)).

But I see no reason to pursue an action against any particular advisor, given that the result of the
misallocation was merely that Peggy's share was funded to a greater extent than Richard's,
contrary to the parties' intent. Any recovery should simply come from the improperly excessive
share that Peggy received through the flawed property division.

the beneficiaries or the successor trustee until after she had resigned as trustee. Again, she might have been following the advice of others, but to the extent her actions, inactions, and decisions worked to the detriment of the Bypass Trust beneficiaries, this should be relevant to the compensation determination.

In terms of determining a more "reasonable" level of compensation for Peggy's tenure as trustee, the following instances and factors militate in favor of reduced compensation:

(1)     The substantial fees paid to Morgan Stanley for their continuous professional management of the Trust's assets throughout Peggy's trusteeship.

(2)     The failure to timely advise the beneficiaries that Richard had remembered them in his trust instrument. Peggy first mentioned the existence of some provision orally in May 2007 (four months after Richard's death and after the Harvard memorial service), and apparently never had the charities notified.

(3)     The 14-month delay in establishing the Bypass Trust, and the lack of notice to the beneficiaries of that trust regarding the circumstances of its creation.

(4)     The failure to provide the beneficiaries notice of the initial division of property (which occurred in 2008, after Peggy became trustee of the Bypass Trust), or share any information whatsoever about how that division was conducted. Had Peggy informed the beneficiaries of the property division when it was happening, the issues raised in this letter would have been addressed at that time and, indeed, would not need to be dealt with now.

(5)     The payment of $220,000 in gifts from Richard's share, instead of the original Joint Trust, contrary to the language of the Joint Trust.

(6)     The failure to provide any information or explanation regarding the exclusion of as much as $910,000 or possibly more than $1,095,000, in assets from the property allocation, and the apparent passage of these amounts outside of probate.

(7)     The early withdrawal of income from the Trust, apparently on the wrong advice of a non-lawyer (see Exh. 25 and Exh. 18 for correspondence regarding this matter).

(8)     The apparent firing – without notice to the beneficiaries – of Mr. Book, the lawyer who drafted the Trust agreement and who advised Richard and Peggy during the creation of the estate plan and Trust, and later Peggy with respect to the property division and the Bypass Trust. While Peggy was certainly entitled to engage another lawyer for redrafting her own trust, Mr. Book's retention with respect to the Bypass Trust would have ensured continuity of advice regarding the Bypass Trust and that relevant information related to the Bypass Trust and property division were preserved, even if not immediately shared with the Bypass Trust's beneficiaries.

(9)    The failure to provide the required accounting to the successor trustee. (Copies of tax returns were provided, but they show that legitimate tax deductions for trust expenses were not taken. Amended returns may have to be filed, if possible. Regarding the current year, repeated efforts have not produced information regarding the recipients and nature of the various 2014 trust expenditures, so as to make the filing of an accurate 2014 tax return possible).

(10)   The appointment of Pamela Clyne as co-trustee, without notice to or consultation with the named successor trustee(s) or beneficiaries, in violation of the terms of the Trust and California Probate law, along with the use of trust funds for the improper appointment.

(11)   The failure to provide notice to or consult with the successor trustee or beneficiaries prior to taking retroactive compensation for seven years, that in large part appears not even to be tax-deductible from trust income.

This is not to suggest that Peggy did not act in good faith; she appears to have acted throughout on the advice of her legal and other (too often mistaken) advisers. Yet in view of this history, the trust's beneficiaries may well question whether they were well served by Peggy's trusteeship. To repeat, the above-listed factors, acts, or omissions certainly support substantially reduced compensation, especially considering the burdens that they have placed upon you as successor trustee.

Beyond what I've itemized here, I do not have enough information to determine whether other actions by Peggy might be characterized as potentially conflicting with her duties as trustee. I know that you have asked for, but not received, documents that would show the purposes of various disbursements that have been made from the Bypass Trust over the years. If and when we receive those, we will be able to evaluate the propriety of those disbursements, and also whether they were properly accounted for in Peggy's filings with the tax authorities. My overall sense is that any problems possibly resulting from past disbursements (e.g. failure to take permissible deductions) are dwarfed by the problems that occurred at the property division. It might simply be best to hold off pushing for these documents until you have received a response on the more important issues.

## D.   Calculations

Below, I provide the totals for each improper deduction[12] or misallocation,[13] each of which is subject to a different appreciation-based multiplier[14]:

---

[12] The "misdeductions" have an effective date of the time of property distribution. The appreciation on the Bypass Trust since then has been 32.9%.

[13] The "misallocations" have an effective date of the date of Richard's death. The appreciation on the assets in the Bypass Trust from that time until August 13, 2014 has been 50.3%; accordingly, I apply a multiplier of 1.503 to each of these numbers.

Improper Deductions (all subject to 1.329 multiplier, representing appreciation of assets in the custody of Morgan Stanley since March 8, 2008):

1. The failure to follow the plain language of the Trust with regard to the $220,000 in gifts: $110,000*1.329 = $146,190.

2. The improper allocation of attorney's fees and appraisal fees to the Bypass Trust alone $10,375*1.329 = $13,788.37.

Improper Exclusions (all subject to a 1.503 multiplier, representing appreciation of assets since January 16, 2007):

3. The failure to follow the plain language of the Trust, the Marital Property Declaration, and the intent of the parties with respect to Richard's community share of the $62,500 personalty: $31,250*1.503 = $46,968.75

4. The failure to follow the plain language of the Trust and related documents with respect to Richard's community share of the AIG/Sun/AllState annuity: $280,196.25 * 1.503 = $421,134.96.

5. The failure to follow the plain language of the Trust and related documents with respect to Richard's community share of Peggy's IRAs: $211,386*0.5*1.503 = $158,856.58.

---

[14] I have calculated the appreciation very conservatively by simply looking to (1) the Book firm's determination of appreciation between the date of Richard's death (assets valued at $1,339,273.00) and the date of the property division (assets valued at $1,514,466.00), an increase of 13.08%, and (2) comparison of the value of the Bypass Trust on March 8, 2008 ($1,263,334.00) with its value as reported on the August 31, 2014 statement from Morgan Stanley today ($1,678,929.90), a 32.9% increase. Based on these numbers, the increase in trust value since January 16, 2007 was 50.3% (since 1.1308 * 1.329 = 1.503). The assets that should have been allocated to the Bypass Trust as of January 16, 2007 (the "improper exclusions") are thus subject to the 1.503 multiplier; the assets that should not have been deducted from the Bypass Trust on March 8, 2008 (the "improper deductions") are subject to the 1.329 multiplier. To the extent that it is determined that additional deductions subsequent to the property division were improper (for example, some or all of the $44,371.52 in trustee fees, and Ms. Parrish's $1,975 fee), then amounts corresponding to those deductions should be added to the "current value" number in determining appreciation. For example, if Peggy's trustee compensation were reduced to $10,000, then the 8/31/2014 Bypass Trust value would increase to $1,713,301.42 and the multipliers would increase to 1.356 and 1.534, respectively. In short, I will revisit the multiplier calculation and make it more precise as things develop. Hopefully, we will be able to reach a mutually-agreeable settlement prior to engaging in a debate about the most appropriate multiplier.

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 34 of 36

> 6. The failure to follow the plain language of the Trust, the Marital Property Declaration, the insurance policy itself, and the intent of the parties with respect to Richard's RiverSource insurance policy: $41,052.50 * 1.503 = $61,701.91.[15]

The subtotal of these amounts is

$146,190
$13,788.37
$46,968.75
$421,134.96
$158,856.58
$61,701.91

$848,640.58.

To this we could add at least the $1,975 to cover the improper appointment of Pamela Clyne as co-trustee. This amount should be recoverable from Ms. Parrish.

That brings the subtotal up to $850,615.58.

As noted, based on the documents that I have seen, it appears that Richard may have retained a community property interest in the Scholar's Choice funds for Cooper and Paris Richman, and Ana Jones. If he did, then that would amount to another $139,736.74 ($185,943.76 * 0.5 * 1.503), bringing the subtotal up to $990,352.32. Adding the full amount of Richard's insurance policy (another $61,701.91) would bring the subtotal up to $1,052,054.24.

This subtotal is without consideration of the issue of the excessive trustee compensation, or other potentially-improper deductions and/or exclusions that we do not have information about. If we assume that a court would award Peggy $10,000 in trustee fees (which I believe was Pam's original settlement offer when we were talking about potentially dissolving the Bypass Trust), then that's another $34,371.52, and there would also have to be a recalculation of the appreciation multiplier for the other numbers, which would involve about $3,000 more. That would bring the total claim up to approximately $1,089,000.

---

[15] As noted, a fairness-based argument could be made that the Bypass Trust was to receive the full value of Richard's insurance policy, assuming that Peggy's comparable insurance policy was held solely for Peggy's benefit outside the trust. If you were to make that argument, the amount here would be $123,403.82.

I also note that as to these proceeds, which were received some months after Richard's death, the 1.503 multiplier might not be accurate. To determine the correct multiplier, we would have to have information about the Trust's assets as of the time of receipt. If you are able to obtain that information, we can modify the multiplier (which will in any event have to be updated to correspond to the date that these payments are actually made).

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 35 of 36

To conclude, though I understand that Peggy has long believed that Richard intended to provide even more for her, the documents I have reviewed strongly suggest that Richard considered a 50-50 split to be fair to Peggy as well as to both sets of ultimate beneficiaries/heirs. And of course he knew that Peggy would not only receive (in addition to her half-share of their property and her own pensions) his TIAA and CREF pensions (amounting to approximately $60,000 per year in 2002 (Exh. 2). To be absolutely certain that she would always have all she needed, he provided that, if needed, Peggy would have full access to the income and even the principal of the Bypass Trust.

## E.    Litigation Considerations

I know that you have no interest in litigating this matter, and I believe Richard would not be happy to think this might come to litigation. I'm hopeful that if we have a conversation with Jim about this, we might be able to reach an amicable resolution. If there are legal arguments that I have missed, either he or Ms. Parrish should be able to point them out. And again, Peggy might have additional documents that might clarify certain issues. But assuming the facts and issues are as I have outlined them above, the main thing is to help Peggy (and her heirs, who would be the chief beneficiaries of the mistakes that were made) understand that a fair property division – without litigation – would be the best way of resolving this matter, consistent with Richard's wishes and Peggy's own intent, as expressed in the various documents related to the Trust. Obviously, you will need to consult with all the beneficiaries prior to accepting any settlement offer; presumably the charities will want their attorneys to be briefed on the issues before they acquiesce to anything.

As set forth above, I believe that the Bypass Trust has a very strong claim for about $850,000, and possibly as much as $1,089,000, both as a matter of law, both trustors' documented intent, and fairness. I also do not think litigation will be excessively expensive. As far as I can tell, for most of the issues raised, there are no disputed issues of fact; for the most part, the case should come down to interpreting the trust language and the various agreements, and applying these to the various assets at issue. Our lawyer should be able to set forth the interpretations in this memo – as modified if necessary based on any new documents or information we receive – and roll them into a summary judgment motion. If so, we may be able to get most of the case resolved without the need for testimony of the parties. Thus, you need not necessarily be concerned about putting Peggy through the ordeal of a trial (or having to contend with that ordeal yourself). The one issue that might not be amenable to resolution on summary judgment is the issue of trustee compensation, which is an inherently fact-bound issue. Perhaps that would be an issue on which the parties could work out a compromise.

\*      \*      \*      \*

I fear that the issues raised in this Memorandum may come as a shock to Peggy, but I strongly believe that the Bypass Trust will need to put on a fair footing. The amounts involved are too large to overlook, even more so perhaps, with the "outside" charities being involved so substantially. Again, as trustee, you owe it to all beneficiaries to diligently investigate and, if warranted, to pursue discrepancies. You should certainly do everything possible to avoid the

Memorandum to Harry D. Krause, Trustee
September 20, 2014
Page 36 of 36

litigation route in favor of a negotiated resolution. We're lucky to have lawyers on both sides of the issue, so we should be able to cut back considerably – if not completely – on attorney fees.

## Request for Documents

1.  As requested in Harry's July 17, 2014 letter to Ms. Parrish (Exh. 22), we still need information relating to each disbursement from the Bypass Trust since its inception, identifying purpose and recipient. What information we have suggests that disbursements might not have been accounted for properly for tax purposes (for instance, it does not appear that the $1,975 payment to Ms. Parrish for the appointment of Pamela Clyne as co-trustee was deducted from taxes). This is information that should have been provided in the required accounting upon turnover of the trusteeship from Peggy to Harry. If Peggy has a file or files in which she has kept all of her records as trustee, we would be grateful for a copy of those files and would do the work of correlating the disbursements ourselves. Providing these files to us might also go a long way toward responding to the other document requests below.

2.  All documents relating to the formation or purchase of the AIG SunAmerica Annuity (Account No. P37 A0018465) (see Exh. 14), along with an explanation of why this was done.

3.  All documents relating to the formation or purchase of the Allstate Life Asset (listed on the Smith Barney statement labeled 11/06/2007 (Exh. 16), and Exhibit D to the Memorandum of Allocation (Exh. 10) as "299994061000"), along with an explanation of why this was done.

4.  Documents sufficient to show who the beneficiary was for Richard's IRA.

5.  All documents relating to any property that existed at the time of Richard's death that Peggy contends is her "separate property," including any document designating that property as "separate property."

6.  All documents relating to any community property existing at the time of Richard's death that Peggy believes was not in the Trust.

7.  A copy of the Estate Planning Book that was enclosed with Mr. Book's April 4, 2002 letter (Exh. 6).

8.  A copy (or the original) of Richard's pour over will (not needed if included in Estate Planning Book, and if the Estate Planning Book is provided).

9.  Documents relating to the creation and custodianship of the Scholar's Choice funds for Paris Richman, Cooper Richman, and Ana Jones (I am just looking for documents that will help me determine whether these assets were properly excluded from the couple's estate in the property division).

10. Documents sufficient to show the value of the Trust at the time of receipt of the insurance proceeds from RiverSource in 2007 (needed for multiplier calculation).

11. Any other documents in Peggy's, Pam's or their lawyers' or advisers' possession that shed light on the issues raised in this memorandum.

I have added this listing separately as "document requests" because I believe that my underlying questions would be best addressed in terms of documentary evidence. The easiest and most complete way to respond to these requests would presumably be to have relevant files turned over to a reliable person and have them copied. If it would facilitate matters, I could ask our lawyer to have relevant files picked up, copied, and then returned.